**Alli KATT, Plaintiff,**

v.

**CITY OF NEW YORK and Anthony Dipalma Defendants.**

**No. 95 CIV 8283 GEL.**

United States District Court, S.D. New York.

June 21, 2001.

Eric F. Leon, Kirkland & Ellis, New York City (Scott R. Samay, Kirkland & Ellis, New York City, David A. Kotler, Dechert Price & Rhoads, Princeton, NJ, of counsel), for Plaintiff Alli Katt.

Kevin J. Smith, Assistant Corporation Counsel, New York City (Michael D. Hess, Corporation Counsel of the City of New York, Patricia B. Miller, Assistant Corporation Counsel, New York City, of counsel), for Defendants New York City and Anthony DiPalma.

### OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Alli Katt, a former civilian employee of the New York City Police Department, sues the City of New York ("City") and Lieutenant Anthony DiPalma ("DiPalma") (together the "defendants"), claiming that they subjected her to a sexually hostile working environment in violation of 42 U.S.C. § 1983, the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* and the New York City Human Rights Law, N.Y. City Admin. Code § 8–101, *et seq.* ("NYCHRL") Following a verdict in plaintiff's favor for $400,000 in compensatory damages against both defendants, plus $1 million in punitive damages against the City, defendants move for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure or, in the alternative, for a new trial under Rule 59. Defendants also move in the alternative for remittitur of the jury's damage award. In a matter of first impression, the City claims in its Rule 50(b) motion that the NYCHRL does not abrogate its common law sovereign immunity from punitive damages, and that the punitive damage portion of the jury's verdict must therefore be set aside. For the reasons that follow, the Court accepts the City's interpretation of the NYCHRL, and strikes the jury's punitive damage award

as a matter of law, but rejects all of defendants' other claims in their entirety. Accordingly, defendants' motions are granted in part, and denied in part.

## BACKGROUND

### A. *Procedural History*

Because the procedural history of this civil rights case is lengthy and labyrinthine, only its most relevant portions are recounted here.

On July 27, 1995, the plaintiff Alli Katt ("plaintiff" or "Katt") filed a *pro se* complaint [1] in this Court asserting, among other things, that she had been subjected to a sexually hostile working environment while employed by the City as a civilian Police Administrative Aide ("PAA") in the New York Police City Department ("NYPD"), and wrongfully terminated from that position in violation of the Americans with Disabilities Act. 42 U S C § 12101, *et seq.* ("ADA"). The City of New York, the NYPD, and four individual police officers were named as defendants. That was the first step of an almost six-year journey in which this case has been transferred amongst four different federal judges, pruned of irrelevant or unsupportable claims, and withered through endless discovery and motion practice.

On September 28, 2000, the case was transferred to me. By then, discovery appeared to have been completed, with all of the necessary pretrial filings, including proposed verdict sheets, jury instructions, and a joint pretrial order, having been fully submitted as of August 1999. Yet from the record, it appeared that no action had been taken in the case since January 20, 2000, when Judge Richard A. Berman denied a defense motion for partial summary judgment. I immediately ordered the parties to appear for a case management conference to discuss the procedural posture of any pending motions, to determine what issues might be appropriate for trial, and to set a tentative trial date. At that conference the parties agreed that Judge Berman had intended, pursuant to his individual practice rules, to accept a second round of summary judgment papers before proceeding with trial. I accordingly permitted the defendants to renew their motions for summary judgment, and requested that they provide the Court with any prior submissions believed relevant. I further requested that the defendants enlarge their motion with whatever material they thought necessary to make their papers fully dispositive of outstanding issues In order to conserve the Court's and the parties' resources, and because plaintiff had already addressed some of the outstanding issues in prior submissions, I directed plaintiff not to submit an additional response until further order of the Court

The Court received the defendants' papers one month later The defendants argued, principally, that no triable issues supported the plaintiff's allegations of sexual harassment, that there was no evidence to support a claim against three of the individually named defendants, and that plaintiff's excessive absences barred her ADA claim as a matter of law. (Defs.' Mem. Supp. Summ J of 11 9/2000) On December 13, 2000, the Court dismissed the claim against the NYPD pursuant to New York City Charter § 396, and directed the plaintiff to respond to the defendants' arguments with respect to the civil rights and ADA claims. *See Katt v. City of New York*, 95 Civ. 8383(GEL) (S.D.N.Y.

---

1. Katt has since retained counsel from the law firms Kirkland & Ellis and Dechert Price & Rhoads

Dec. 13, 2000) (order granting partial summary judgment). On January 22, 2001, the Court granted defendants' motion for summary judgment as to three individual defendants, and dismissed plaintiff's state law disability claim, but denied the motion in all other respects, thereby allowing the plaintiff to proceed to trial against the City and Lieutenant DiPalma. *See id.* (Jan. 22, 2001) (second order granting partial summary judgment). Plaintiff withdrew her federal ADA claim on the eve of trial.

By the time the parties submitted their second joint pretrial order, the parties had enjoyed ample opportunities in the course of more than five years of litigation to raise whatever issues they had deemed dispositive or worthy of pretrial consideration. Accordingly, the joint pretrial order submitted to me on February 13, 2001, boiled down plaintiff's requested relief to:

> An award of compensatory damages for the pain and suffering, humiliation, degradation, emotional distress, and physical ailments she has suffered, as well as punitive damages in the maximum amount allowed by law, for defendants' creation and fostering of a sexually hostile work environment in violation of the New State Human Rights Law, the New York City Human Rights Law, and 42 U.S.C. § 1983.

(Joint Pretrial Order ("JPTO") of 2/13/2001 at 1)[2] In addition to denying plaintiff's allegations, the City proposed to assert an affirmative defense under *Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("*Burlington-Faragher* defense"), arguing that the NYPD exercised reasonable care to prevent and correct any sexually harassing behavior, and that plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities provided by the NYPD. (JPTO at 2.)

On February 16, 2001, the Court held its final pretrial conference, addressing a number of motions *in limine,* one of which will be discussed further below. Trial commenced on February 20, 2001; the jury returned its verdict on March 1, 2001.

### B. *The Trial*

In setting forth the following salient facts, the Court views the evidence in the light most favorable to the plaintiff, and grants her every reasonable inference that the jury might have drawn in her favor. *See, e.g., Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 203 (2d Cir.1998) (in ruling on a post-trial motion for judgment as a matter of law "a court must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor") (internal quotation marks and citations omitted). In fairness, however, it must be emphasized that the defendants' lay and expert witnesses fervently disputed the plaintiff's contentions, and the Court will note, where relevant, the issues on which there was conflicting testimony. The trial essentially presented a question of credibility, pitting plaintiff's account of her relationship with her supervisor DiPalma against his sharply contrasting account of the same events, much of the remaining evidence was offered in an effort to corroborate one side or the other.

### 1. *Katt's Career at the NYPD*

All of the events relevant to this case occurred in the period beginning in December 1990, when Katt was hired to work in the NYPD, and ending in November 1992, when she was terminated from her employment there

---

**2.** Plaintiff withdrew her Section 1983 claim against the City at trial (Tr. 867)

On December 10, 1990, Katt was hired by the City to work as a PAA in the NYPD. Following the completion of a civilian-employee training program at the City's Police Academy, Katt was assigned to the NYPD's Seventh Precinct, where, beginning on January 11, 1991, she regularly worked a weeknight "tour" from 4:00 p.m. to 12:00 a.m., until her termination on November 13, 1992. (Tr. 61.) At all times relevant to this case, Katt was under the direct supervision and management of defendant DiPalma, the Lieutenant who was generally in charge of all employees at the Seventh Precinct during Katt's shift. As a PAA, Katt's basic job responsibilities consisted of answering the precinct telephone, directing calls, fielding complaints, and providing general secretarial support services to police officers and ranking supervisors. (*Id.* 63–64) The evidence demonstrated that Katt performed her job responsibilities at or above a satisfactory level.

Beginning in August of 1992, Katt missed numerous days of work. These absences were partially due to physical and emotional injuries Katt suffered following a violent assault at the hands of an ex-boyfriend (*Id.* 153–54.) Trial evidence permitted the conclusion that these absences were also in some part due to the symptoms and consequences of Katt's experiencing a continuous and pervasive sexually hostile working environment at the Seventh Precinct. (*Id.* 334–44) On November 13, 1992, the City terminated her employment on grounds of excessive absenteeism (PX 3 & 4)

### 2. *Evidence of a Sexually Hostile Work Environment*

Specific conduct that allegedly created a sexually hostile working environment at the Seventh Precinct will be considered in three categories: (1) gestures and comments of a sexual nature made by DiPalma and other male employees of the Seventh Precinct, some of which were directed to Katt personally, and some of which were directed to civilian female employees generally; (2) DiPalma's unwelcome and degrading physical touching of Katt in a lewd and sexually suggestive manner; and (3) physical evidence of harassment, including a photograph of the plaintiff taken by DiPalma and inscribed with a sexually offensive notation, a pornographic cartoon, and a lewd Christmas greeting card.

### a. *Sexually Hostile Gestures and Comments*

Katt testified that over the course of her employment at the Seventh Precinct she was continually subject to a sexually hostile work environment which grew worse as time wore on. (Tr. 73.) She testified that from "day one" at the Seventh Precinct, she experienced a "rowdy atmosphere" with "a lot of sexual innuendos, sexual comments, questions, [and] intrusive questions" regarding her personal life and personal sexual habits. (*Id.* 73.) Male employees at the precinct routinely touched her on the waist and referred to her as "sweetheart" or "honey." (*Id.* 73.) When it became known that Katt had recently divorced her husband, the sexual innuendos and inappropriate touching worsened. (*Id.* 76.) [3]

---

**3.** Evidence of a generally rowdy atmosphere laced with sexual innuendo was corroborated by Raymond Perez, a janitor at the Seventh Precinct who worked the same tour as DiPalma and Katt. (Tr. 299–306) Other witnesses, principally Lula Williams (*id.* 684–98) and Myrtis Colley (*id.* 675–79), both PAA's called by the defendants, disputed that characterization, though Williams admitted that she "tune[d] out what [she] didn't want to hear" (*id.* 604), and Colley worked a different tour than DiPalma and Katt (*id.* 664)

Katt testified that DiPalma was the chief perpetrator of the precinct's sexually hostile environment. For example, DiPalma regularly asked Katt whether she was a "moaner or a screamer" (*id.* 85), whether she "had ever had toe sex" (*id.*), whether there had been sexual indiscretions in her marriage (*id.*), whether she was wearing "panties or a thong or nothing at all" (*id.*), and, on one occasion, whether he could put his "throbbing manroot" into the "wet recesses" of her "femininity" (*id.* 87) Katt further testified that DiPalma admonished her to "wear colors," instead of the black clothing she typically wore, since "black tends to hide the size of your breasts." (*Id.* 94.) DiPalma continuously referred to Katt's body parts, asking, for example, whether her belly button was "an inny or outty" (*id.* 86), and that he liked the "little blond hairs" on Katt's shoulders (*id.* 87). Katt testified that these comments were typically made in the course of regular business conversations which DiPalma had a habit of "twist[ing] in a perverted way." (*Id.* 86)

Further incidents of harassment included DiPalma's regularly gesturing to Katt in a degrading and sexually suggestive manner. Katt testified that DiPalma once stood over her desk, flipping through a Victoria's Secret lingerie catalog, pointing to the models, and asking Katt whether she would agree to model lingerie for him. (*Id.* 101.) On one occasion, DiPalma "licked his lips and rolled his tongue over his lips" while staring at Katt eating lunch. (*Id.* 91.) On at least two occasions DiPalma offered to drive Katt home at the end of her shift. (*Id.* 117.) DiPalma and Katt both lived on Staten Island, approximately twenty minutes by car from the Seventh Precinct, which was located on the lower east side of Manhattan During one of these trips, DiPalma refused to turn down the air conditioner unless Katt "said the magic words" that her "nipples [were] get-

ting hard" (*Id* 119–20) When Katt reached for her sweater instead, DiPalma put his arm across her chest to prevent her from covering herself. (*Id.* 120) On another trip to Staten Island, DiPalma asked Katt if alcohol "made [her] horny" (*Id.*) When Katt admitted that it did, DiPalma asked whether they could "stop for a drink" (*Id.*) She said no, but DiPalma continued to ask for the remainder of the ride (*Id.*) On this same trip, DiPalma asked if Katt would "play a game" in which she would have to "lean over and kiss" DiPalma whenever they passed a "landmark" such as underpass, overpass or stoplight. Katt refused to play. (*Id.*) Other officers also drove Katt home and, on occasion, touched Katt's leg, or asked whether they could stay overnight at Katt's apartment. (*Id.* 118.)

Though Katt could not provide exact dates for these incidents, she testified that they occurred continuously, on "a regular basis" (*id.* 92), throughout her two years of employment at the Seventh Precinct, and that "generally speaking, [DiPalma] became raunchier and more vicious as time wore on." (*Id.* 93.) The harassment, in short, "was very, very regular." (*Id.* 96.)

b. *Sexually Hostile Physical Contact*

DiPalma also physically touched Katt in an unwelcome, degrading and sexually suggestive manner. Plaintiff testified that DiPalma sprayed her with a water pistol on a summer day when she was dressed in a white t-shirt, and announced to the precinct that he hoped to wet plaintiff's nipples to "have them show through" (*Id* 111) Although DiPalma flatly denied ever using a water gun at the station house, or even possessing one (unless perhaps confiscated street-vendor goods crossed his desk) (*id.* 623–27), this incident was corroborated by the testimony of Raymond Perez, a civilian employee who worked as a janitor at the Seventh Precinct on the same tour as Katt

and DiPalma (*id.* 314). Perez testified that Katt was visibly shaken and "pissed off" after being squirted with the water pistol (*Id.* 315–16) [4]

DiPalma sat on a swivel chair, at a desk located near the Seventh Precinct's fax and copy machines, which Katt used to carry out the various secretarial duties of a PAA. Katt testified that whenever she had to stand near DiPalma's desk to copy documents, DiPalma would roll over to her in his chair and "rub his knees up against" her. (*Id.* 112.) This happened repeatedly. (*Id.* 114) DiPalma also made it a habit to "rub up against" Katt, and impede her progress, whenever she walked along the precinct's narrow hallway which led from her desk to the precinct's copy and fax machines. Katt testified that during such hallway encounters, DiPalma would "rub up against" her, and ask "if he could touch [her] leg." (*Id.* 112.)

Katt further testified that DiPalma once forced himself onto her lap while she was seated in the precinct's clerical room. (*Id.* 112–113). DiPalma entered the clerical room, saw Katt, and said "come on, let me sit on your lap." (*Id.* 113.) Katt said nothing. DiPalma then approached Katt, and, before she could "pull away, . . . forced himself" onto her lap and "wouldn't get off." (*Id.*) DiPalma stayed on Katt's lap for "few minutes," and did not stand up until Katt screamed that "he was going to break [her] legs" (*Id.* 115) DiPalma is a large man, muscular and over six feet tall, and Katt, who is petite, testified that she was "really hurting" from the weight of DiPalma on her lap, and felt as if her legs

were breaking (*Id.*) Though the incident lasted only a few minutes. Katt testified "[i]t was so humiliating [that] to me it felt like forever." (*Id.*)

Another incident of physical touching occurred while Katt was seated in the precinct's civilian lounge during a meal break Katt testified that as she was finishing a snack, DiPalma approached her from behind and touched the back of her neck with his tongue. (*Id.* 116.) Katt screamed, turned around and found DiPalma "sticking his tongue out and curling it, laughing." (*Id.*) Raymond Perez also corroborated this incident, though he could not confirm whether or not DiPalma had made "any contact" with the back of Katt's neck. (*Id.* 316.)

c. *Physical Evidence of Sexual Harassment*

Katt presented physical evidence to corroborate her testimony of a sexually hostile working environment at the Seventh Precinct. First, Katt testified that after she had worked at the precinct for "only a few months," DiPalma stood over her desk with a Polaroid camera and, with other officers "howling and cheering him on," photographed Katt against her wishes. (*Id.* 80–81.) A few weeks later, DiPalma presented Katt with the photograph of her seated at her desk. (*Id.* 81.) On the bottom of the photo was a handwritten inscription: "The Real Inner Workings of the 976 Love Line." (*Id.* 81) Katt understood the inscription to liken her to "a telephone porn operator." (*Id.* 83.) [5] The

---

4. Perez, who had been subpoenaed to testify (Tr. 292), did not appear cooperative on direct examination by plaintiff's counsel, and was manifestly uncomfortable providing testimony harmful to DiPalma His testimony was thus particularly effective corroboration of plaintiff's narrative

5. Telephone numbers with a 976 prefix are frequently used for pornographic services. *See, e.g.,* 134 Cong. Rec H1276–05 (1988) (Statement of Rep. Stark) (sponsoring legislation to "Stop Smut with Telephone Blackage [*sic*] of 976 and 1–900 Numbers"); Cindy L. Petersen, Note, *The Congressional Response to the Supreme Court's Treatment of Dial–a–Porn,*

photograph was admitted into evidence. (PX 32.)

Though DiPalma testified that he could not recall whether he had inscribed the photograph (Tr. 631–33), plaintiff presented an expert forensic document examiner to demonstrate that he had. This expert witness, James M. Palladino, testified that upon comparing the inscription on the photograph with four separate samples of DiPalma's handwriting (PX 34 & 35), his "definite and conclusive" finding was "that the writing in the border of the photograph was in fact written by Anthony DiPalma." (Tr 461.) Palladino painstakingly described to the jury the process by which he analyzes documents and handwriting samples, presenting the inscribed photograph alongside one of DiPalma's handwriting samples, he demonstrated, letter by letter, "that the two sets were in agreement or similar in all important details and contained no significant difference." (*Id.* 467) Palladino concluded that "the only person who could have written [the inscription on the photograph] was the defendant. Anthony DiPalma." (*Id.* 483.) [6]

Also admitted into evidence was a pornographic cartoon which Katt testified DiPalma gave her. This cartoon, on its face, depicted four fully-clothed dancing couples. (PX 60.) Katt testified that DiPalma called her to his desk, asked her to pick her favorite couple from the cartoon, and then to unfold the cartoon. (Tr. 102–103.) Katt initially refused, but DiPalma insisted, stating that the cartoon was a "personality test." (*Id.* 104–105.) Unfolding the cartoon caused it to transmogrify, revealing four half-naked couples, engaged in various sex acts. (*Id.*) [7]

### 3. Effects of the Harassment on Katt

Katt testified that these regular incidents of degrading and sexually provocative conduct, as well as unwelcome sexual advances, caused her to suffer severe headaches, stomach ailments, diarrhea, increased upper respiratory allergies and infections. (*Id.* 150.) She testified that she felt continually run down, yet had trouble sleeping. (*Id.*) She once vomited during her commute to work, although, she claimed, she had a very strong stomach and had rarely if ever vomited in the past (*Id.* 152) She testified that to the present day she suffers from insomnia, and that she suffers from frequent nightmares about her experiences at the Seventh Precinct. (*Id.* 162–63.) She further testified to frequent thoughts and flashbacks to those experiences during intimate moments with men—that she "make[s] an automatic connection between any sexual playfulness or affection, touching . . . and being harassed." (*Id.*) Because of this "automatic connection," she testified that she "can't really have an intimate sexual relationship like [she] used to." (*Id.* 166.)

---

78 Geo L.J.2025, 2044 (1990) ("The dial-a-porn industry commonly uses the prefixes 550, 900, and 976")

**6.** DiPalma emphatically denied all of the offensive behavior attributed to him by Katt (Tr 577, 579–583, 590, 593), describing his interactions with her as "business like and cordial" (*id.* 576) Whether or not the jury accepted all Katt's allegations, DiPalma's credibility was significantly undercut by his denial or equivocation concerning incidents such as the photograph (*id.* 631–33) and water pistol epi-

sodes (*id.* 626), which were corroborated by physical evidence or independent witnesses

**7.** Katt also presented evidence of a lewd Christmas card that was given to her by one of the Seventh Precinct's janitors (PX 61) Though she did not recall whether or not she had told DiPalma or anyone else about the card, it was admitted as evidence of the general pervasive sexually hostile working environment at the precinct (Tr 107–108)

This testimony was corroborated by Dr. Marsha Jane Kleinman, a licensed clinical psychologist who performed three psychological evaluations of the plaintiff in late 1998 and early 1999. (*Id.* 326–441.) Kleinman concluded from these evaluations that the plaintiff was "suffering from post traumatic stress disorder as a result of being sexually harassed." (*Id.* 336.) She testified that Katt exhibits "hallmark" symptoms of post traumatic stress disorder ("PTSD"), such as re-experiencing the events of harassment from various "environmental triggers." (*Id.*) For example, seeing police cars or officers, or sensing sexual interest from a male acquaintance, have become sources of debilitating anxiety for Katt. (*Id.* 336–38.) Kleinman further testified that being fired from the police department was a "fatal blow" which has left Katt "unable to function." (*Id.* 338, 362.) Though Katt had other psychological problems before working for the NYPD, and experienced traumatic events in her personal life during her employment there—including a violent car accident and a physical assault—Kleinman testified, "with a reasonable degree of psychological certainty," that the harassment perpetrated by DiPalma and others at the Seventh Precinct triggered the condition that has caused her debilitated psychological state.

(*Id.* 339.) Kleinman concluded, moreover, that Katt's "nonfunctional, barely functioning" state is probably "permanent," and that her psychological condition is unlikely to improve "to any great extent," even with professional counseling. (*Id.* 361–62.)[8]

### 4 Failure to Complain

There was considerable evidence at the trial about whether the NYPD took effective steps to prevent sexual harassment, and whether Katt failed to take advantage of its programs by complaining to someone within the NYPD regarding the harassment at the Seventh Precinct. This evidence related to the plaintiff's federal civil rights claim against the City under § 1983, and also to the City's *Burlington-Faragher* affirmative defense, which would have shielded the City from all of plaintiff's claims. The City offered deposition testimony and documentary evidence reflecting that it had in place programs to train personnel regarding sexual harassment and equal employment opportunity issues, to receive and adjudicate complaints, and to inform employees about the existence of these programs and grievance mechanisms. (*Id.* 871–85; DX F, I, K.)

**8.** Kleinman's testimony was disputed by Dr. Douglas Anderson, a psychiatrist called as an expert witness by the defendants. Anderson emphasized that even before her employment with the NYPD. Katt had suffered psychiatric hospitalizations, and noted that Kleinman's own diagnosis of Katt as suffering from Schizotypal Personality Disorder (Tr. 339) meant that Katt was liable to have difficulty separating fact from fantasy (*id.* 742–43, 754, 759, 760–61). In addition to casting doubt on Katt's general capacity to tell the truth, Anderson's testimony strongly disputed Katt's and Kleinman's claim relating to the effects of the harassment on Katt. Anderson attributed Katt's post-traumatic symptoms, particularly her difficulties with intimacy, to the violent assault she suffered at the hands of a boy-friend, in August 1992. (*Id.* 746–47, 751, 755–58) Kleinman testified that she had reviewed Anderson's evaluation of Katt, and disagreed with most of his conclusions. (*Id.* 355–61) Had the case been tried to the Court, I might well have accepted Anderson's account of the causes of Katt's long-term symptoms as more plausible than Kleinman's, though both experts were well-qualified and offered detailed evidence in support of their conclusions, and both at times appeared doctrinaire and partisan. Needless to say, however, as will be discussed further below, the jury was entitled to accept Kleinman's testimony, or to reject it and still compensate Katt for the humiliation and suffering she experienced while employed at the Seventh Precinct

Katt testified that her failure to complain resulted from tacit and explicit cues from DiPalma and others at the NYPD never to report or complain about the official misconduct of police officers. She testified that during her police academy training women recruits were instructed that they "have to be tough" (*id.* 75); that they were entering a "male dominated field and [they] have adapt" (*id.*); and that if they "can't take it," then they should "get out" (*id.* 61). Katt further testified to experiencing implicit and explicit threats that she would suffer recriminations for reporting official wrongdoing at the Seventh Precinct. On one occasion Katt had taken a personal day, but refused to divulge the details of her personal life—and the specific reasons for her absence—to DiPalma and another officer. (*Id.* 99–102.) Katt testified that she was told by DiPalma ("in a taunting way") that unless she divulged "what was going on in her personal life" she could be "facing a termination." (*Id.* 101.) On a number of occasions, moreover, Katt advised DiPalma that his conduct offended her and privately asked him to stop. She testified that whenever she complained to him, he would "start mocking [her], licking his lips and saying more offensive things." (*Id.* 124) Other times, Katt testified, DiPalma would mockingly offer her the number of the NYPD's Equal Employment Opportunity Board, telling her, "go ahead, call the EEO." (*Id.* 125.) Katt further testified to a precinct-wide understanding that such complaints were never made, and that she therefore "had no reason to believe that [complaints] would work" (*id.* 140), or that there was any way for her to "realistically" expect redress for the humiliating treatment perpetrated by Seventh Precinct officers (*id.* 139–40).

Finally, Katt testified to an explicit threat from DiPalma, occurring early in her employment at the Seventh Precinct.

Katt had been ordered by one of the precinct's officers to carry an industrial-sized broom and to clean up around the officer's desk. (*Id.* 140–41.) She complained that such duties were not part of her job description, but the officer ignored her and pointed to the broom. Katt testified that she felt humiliated, that she was wearing a "lacy feminine shirt and sandals" on account of a hot summertime day, and that men were standing around watching her sweep the floor (*Id.* 142.) She tried to complain to DiPalma, but he refused to listen. (*Id.* 142–43.) She then told DiPalma that unless he provided her with some means of redress, she would "go over [his] head," to let his supervisors "know that [she] tried to complain" about an incident of sexual harassment, and that DiPalma "wouldn't do anything about it." (*Id.* 143.) DiPalma answered that were Katt ever to so "complain about any other officer," she "would be labeled a rat" within the precinct, and that she "would be ostracized," with a "reputation that would follow [her] wherever" she worked within the NYPD. (*Id.*) Katt concluded that DiPalma's comments "drove home . . . what [she] already knew that it's just not done, you don't file a complaint against another member of the service." (*Id.* 143.)

The plaintiff further presented evidence of a general culture within the Seventh Precinct, and the NYPD generally, by which officers and civilian employees did not report a fellow employee's misdeeds or infractions to appropriate authorities. For example, Lula Williams, a co-worker of Katt's at the Seventh Precinct, testified that she was unaware of formal complaint procedures available for victims of sexual harassment, and that she personally would fear reporting any such incidents of harassment for fear of receiving a command discipline. (*Id.* 696.)

Another co-worker, Stella Morales Castillo ("Castillo"), indirectly corroborated this implicit understanding. Castillo worked at the Seventh Precinct with Katt, and continues to work there to this day She is married to an New York City Police Officer. (*Id.* 738.) Katt had testified that the two were close friends (*id.* 121–24), and other evidence appeared to demonstrate as much Castillo had invited Katt to her wedding (*id.* 122), and Castillo had sent Katt a postcard from Disney World depicting a smiling Mickey Mouse and Donald Duck, and stating in bold letters: "Best Friends are Only A Post Card away!" (PX 167.) The postcard was signed, "Love, Your Friend Stella." (*Id.*) Williams corroborated Katt's testimony that Castillo and Katt were friendly with one another. (Tr. 691–92.)

Despite this evidence, Castillo testified that Katt was "just a coworker," and that the two were not friends. (*Id.* 732–33.) She testified that she never had a personal conversation with Katt, and denied Katt's characterization of their relationship as one of "little sister or big sister." (*Id.* 723.) Cross-examination brought out that Castillo's testimony at trial contradicted her deposition testimony on a number of points. (*Id.* 730, 732, 737.) A reasonable juror could easily have concluded from the contradictions in Castillo's testimony, as well as from her manifestly uncomfortable demeanor, that her testimony was less than truthful, and represented an example of the closed culture Katt contended existed at the precinct.

Plaintiff also offered the testimony of Dr. Michelle Paludi, a professor of psychology and human resource management and an expert in workplace sexual harassment, and Dr. Stephen Leinen, a professor of criminology and former NYPD detective with an academic specialty in the study of police organizational culture Paludi testi-fied that in her expert opinion, based on her review of the programs, manuals, and training materials presented by the City, the NYPD's programs to combat workplace sexual harassment were inadequate (*Id.* 494–99, 518–21, 523, 526) For example, Paludi testified that victims of sexual harassment at the NYPD would be unsure how to file a complaint, and of what would be expected of them if they did file a complaint. (*Id.* 497–99.) Moreover, employees were not "instructed in what the institution would do in terms of how they would investigate a complaint, the role of witnesses, how they would deal with issues of confidentiality" (*Id.* 496) Paludi testified that such knowledge of how complaint mechanisms operated was a necessary component of any effective training and prescriptive workplace harassment program. (*Id.* 501.) The defendants offered no expert witnesses to rebut this testimony, relying on cross-examination and arguments to the jury that it should find from the documents themselves that the City's program was adequate. It was for the jury to determine the credibility of Paludi's testimony, and what weight, if any, to give her testimony in deciding whether the City had met its burden of proof in establishing its affirmative defense.

Leinen testified that based on his own experience as an officer in the NYPD, and his academic research into the culture of police organizations in general (and the NYPD in particular), that the paramilitary structure of police departments and the general stress of police work create a culture in which police officers so value loyalty and mutual support that complaints or truthful testimony about misconduct by officers is strongly disfavored and met with ostracism or other retaliation According to Leinen, this culture is effectively communicated to new officers and civilian employees, such that it would be reasonable for police employees to feel discouraged from

complaining about misconduct and to fear the repercussions of such complaints. (*Id.* 886–916) Leinen's testimony will be discussed in further below; suffice to say for the present that evaluating his opinion was also a matter for the jury

### 5. *The Jury's Verdict*

The jury received the Court's charge on February 28, 2001. (*Id.* 990–1026.) Because the special requirements for municipal liability under § 1983, *see, e.g., Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), would have required a confusing divergence between the instructions relating to the federal and state claims against the City, plaintiff withdrew that claim (Tr. 867), permitting a single set of instructions defining the identical elements of hostile-environment discrimination by an individual under § 1983 and the state and city statutes, and by the City as an employer under the state and city laws. On March 1, 2001, the jury returned a verdict in favor of the plaintiff and against DiPalma and the City for $400,000 in compensatory damages. (*Id.* 1030–32.) The jury further returned a verdict against the City for $1 million in punitive damages under Section 8–502 of the NYCHRL. (*Id.* 1057.) It did not award punitive damages against DiPalma.

The Court refrained from entering judgment on the jury's verdict. This was because, midway through the trial, the question of whether a party could be awarded punitive damages against the City pursuant to the NYCHRL had arisen. Though it was clear that such damages were not available under federal and state law, the issue under the City's own ordinance appeared to be one of first impression, which neither party had fully briefed or researched. (*Id.* 931–35.) The Court therefore had chosen to allow the jury to determine whether such damages should be awarded in this case, and, if the jury so chose, to analyze the issue upon formal briefing. (*Id.* 935.)[9] In light of the jury's verdict, the Court reserved decision on the issue of punitive damages, pending submission of post-trial motions. (*Id.* 1059–61.)

### D. *Post–Trial Motions*

On April 23, 2001, the City timely moved on a number of grounds for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure as to both compensatory and punitive damages. Defendant DiPalma moved for judgment as a matter of law as to compensatory damages. Additionally, both defendants moved on a number of grounds for a new trial under Rule 59 of the Federal Rules of Civil Procedure. In the alternative, both defendants moved for remittitur of the jury's compensatory damage award. The matter was fully submitted to the Court on June 8, 2001, without oral argument. This opinion addresses all issues raised in the defendants' motions.

### DISCUSSION

"Where a party moves jointly under Rules 50(b) and 59(a), the court must rule separately on each motion" *See, e.g., In re Asbestos Litig.*, 986 F.Supp. 761, 765 (S.D.N.Y.1997) (citing 9A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure*, § 2539, at 361 (2d ed.1995)). Accordingly, the de-

---

**9.** Specifically, the Court stated: "I want[ ] . . . to make clear that the issue is going to the jury in a very provisional way and that if the jury does return a verdict of punitive damages against the City, I regard those as, to say the least, open issues, and it should come as no surprise after a verdict, if there is such a verdict, that I will take a motion to set aside that aspect of the verdict extremely seriously for those reasons" (Tr. 935)

fendants' motions will be discussed separately, beginning with their Rule 50 motion for judgment as a matter of law.

## I *Rule 50 Motion for Judgment as a Matter of Law*

██ Rule 50 of the Federal Rules of Civil Procedure generally "governs motions for judgment as a matter of law in jury trials It allows the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 445, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (quoting 9A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2521, at 240) A post-trial motion for judgment as a matter of law made pursuant to Rule 50(b) will be denied "unless, viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *Cruz v. Local Union Number 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154–55 (2d Cir.1994) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)); *see also Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir.2000) (same). The Court is "required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The Court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988) (internal quotation marks and citations omitted).

Defendants move for judgment as a matter of law on three principal grounds.

### A. *Punitive Damages against the City of New York*

The City first argues that punitive damages are generally unavailable against municipal corporations, and that a court should not construe a local statute to allow such damages absent a clear expression of contrary legislative intent. It contends that because no such expression of intent is found in the NYCHRL, it is entitled to judgment as a matter of law on that portion of the jury's verdict awarding punitive damages (Defs' Post–Trial Mot. at 7–17.) The Court agrees Though contrary interpretations of the statute are plausible, principles of New York law governing the construction of statutes enacted in derogation of the common law demand a clear statement of legislative intent before a court may conclude that a municipality has intentionally waived its centuries-old sovereign immunity from punitive liability. Accordingly, because the Court finds no such clear expression in the NYCHRL, the portion of the jury's verdict awarding $1 million in punitive damages against the City is set aside as a matter of law.[10]

---

**10.** Because the Court grants defendants' motion for judgment as a matter of law with respect to punitive damages, it need not consider the City's other arguments under the NYCHRL. On consent of the parties, the Court appropriately instructed the jury on the common standard of a sexually hostile work environment, rather than risk confusion by instructing the jury separately on each of plaintiff's claims. *See, e.g., Klein v. London Star Ltd.*, 26 F.Supp.2d 689, 693 (S.D.N.Y. 1998) (proper jury instructions should avoid jury confusion in a race discrimination action brought under federal, state, and city statutes). The jury then awarded compensatory damages pursuant to a common standard of liability, without distinguishing between the plaintiff's separate causes of action. Since

### 1. *The Parties' Contentions*

As stated above, the City moved for judgment as a matter of law on the issue of punitive damages at the close of all the evidence. The Court took the issue under advisement, and permitted the question of the City's liability in punitive damages to go to the jury in a "very provisional way." (Tr. 935.) After the jury returned a verdict for $1 million against the City, the Court requested post-trial briefing on whether the NYCHRL, as amended in 1991, abrogates the long-standing common-law principle that New York municipalities are immune from punitive damage awards. The plaintiff argues that it does. She contends that the NYCHRL is a remedial ordinance, and that its purpose of deterring discrimination would be thwarted if the Court were to find that municipal employers were shielded from the statute's punitive liability provision. (Pl.'s Post-Trial Mem. at 13) The City counters that whatever the purpose of the NYCHRL, this Court is without authority to read an implicit waiver of municipal immunity into the statute without an explicit legislative instruction to do so. (Defs.' Post-Trial Mem. at 14–16.)

Although both parties rely on the text of the NYCHRL, that text hardly provides a clear-cut answer. There is no dispute that NYCHRL § 8–502(a) provides a private right of action for damages, including punitive damages, for persons subjected to discriminatory practices or harassment. *See, e.g., Hazeldine v. Beverage Media, Ltd.,* No. 94 Civ. 3466(CSH), 1997 WL 362229, at *2 (S.D.N.Y. June 27, 1997) ("Section 8–502(a) provides for punitive damages in any civil action under the [NYCHRL] by persons aggrieved by an unlawful discriminatory practice").[11] Nor is there a dispute that § 8–107(a) generally deems it an unlawful discriminatory practice:

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or discharge from employment such person or to discriminate against such person in competition or in terms, conditions or privileges of employment.

NYCHRL § 8–107(1)(a).

One might expect that the statute would contain a definition of "employer," which

---

the City never disputed that it could be found liable for compensatory damages pursuant to both the State and City Human Rights Laws (JPTO at 2–3), *see also Menes v. CUNY Univ. of New York,* 92 F Supp.2d 294, 307 (S.D.N.Y. 2000) (municipal defendant may be liable under the State Human Rights Law, City Human Rights Law, and § 1983), there is no consequence as to the compensatory damage award to the City's liability *vel non* under the NYCHRL, which differs from the State Human Rights Law only in its provision for punitive damage liability *See, e.g., Walsh v. Covenant House,* 244 A.D.2d 214, 664 N.Y.S.2d 282, 283 (1st Dep't 1997) ("The State and City Human Rights Laws apply the same Federal standards for determining hostile environment sexual harassment claims, and differ only in that the City law allows for

the recovery of punitive damages") (citations omitted)

**11.** The provision reads in pertinent part as follows

> Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title or by an act of discriminatory harassment or violence as set forth in chapter six of this title shall have a *cause of action in any court of competent jurisdiction for damages, including punitive damages* ... with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence.

NYCHRL § 8–502(a) (emphasis added)

might clearly settle that the City itself is or is not a party that can violate § 8–107(a), and thus be subjected to the remedies provided in § 8–502(a). Alas, it does not. The subdivision of the "definitions" section that addresses the term "employer" does not, strictly speaking, *define* the term at all; rather, it merely *excludes* from the term's reach "any employer with fewer than four persons in his or her employ." *Id.* § 8–102(5). The parties therefore seek assistance from other definitions that may be relevant. For example, the NYCHRL defines "covered entity" as "a person required to comply with any provision of Sec. 8–107 of this chapter." *Id.* § 8–102(17). A "person" in turn is defined as "one or more natural persons, proprietorships, partnerships, associations, group associations, organizations, *governmental bodies or agencies*, corporations, legal representatives, trustees, trustees in bankruptcy, receivers." *Id.* § 8–102(1) (emphasis added) It is noteworthy, however, that the term "covered entity" nowhere appears either in § 8–107(1)(a), which defines the unlawful conduct, or in § 8–502(a), which provides the civil remedy for that conduct, and the term "person" appears in those sections only in reference to the aggrieved party, not to the potential defendant

Plaintiff reads these definitions to provide aggrieved public employees with a private right of action against municipal employers for damages, including punitive damages in appropriate cases (Pl.'s Post–Trial Mem. at 14) She argues that (a) since the definition of "person" includes "gov-ernmental bodies or agencies," (b) since the definition of "covered entities" includes any "person" required to comply with § 8–107, and (c) since the definition of an "employer" (one of the types of parties upon which duties are imposed by that section) does not exclude governmental bodies or agencies, then it follows that the City Council "necessarily and obviously" intended to waive whatever sovereign immunities might shield governmental employers from otherwise appropriate punitive liability for commission of discriminatory practices in violation of Section 8–107(a). (*Id.* 14–15.) The City counters that although the NYCHRL generally permits aggrieved individuals to receive punitive damages, nothing in the statute is sufficiently explicit to infer an intentional abrogation of the City's well-established common-law immunity from such damages, and that without such explicit authorization, this Court must not attribute to the City Council an intention to undo a principle that for over one hundred years has shielded New York City from the threat of paying punitive damages for the unlawful conduct of its officials. (Defs.' Post–Trial Mem. at 14–16.)

Both parties support their respective positions with a number of cases, though neither points to any authority (and the Court is aware of none) specifically addressing whether punitive damages are recoverable against New York City pursuant to the NYCHRL. It is somewhat surprising that this issue appears to be one of first impression in this or any other court.[12] Because the issue is purely one of

---

**12.** Or perhaps it is not so surprising. Not all law is reported law, and parties are unlikely to litigate an issue to the extent resulting in a reported opinion if the judicial outcome is certain, or if the costs of doing so outweigh the likelihood of success on the merits. *See, e.g.,* William M. Landes & Richard A. Posner, *Legal Precedent: A Theoretical and Empirical Analysis,* 19 J.L. & Econ. 249 (1976). As explained below, it is generally settled that municipalities are immune from paying punitive damages unless expressly authorized by statute, and that this rule applies under both the parallel federal and New York State causes of action. Perhaps, therefore, parties have simply assumed that the same rule ap-

state law, with ramifications for the allocation of scarce public (state and local) resources, it would surely best be resolved by the courts and legislative authorities of New York. *See, e.g.,* Henry J. Friendly, *Federal Jurisdiction: A General View,* 142 (1973) (noting the awkwardness of federal courts' having to decide important questions of state law) Without the luxury of definitive guidance from the state courts, however, federal courts construing state and local statutes as a matter of first impression must carefully review governing principles of state law and make their own independent prediction of how the state's highest court would resolve the particular issue before it. *See, e.g., Sprint PCS L.P. v. Conn. Siting Council,* 222 F.3d 113, 115–16 (2d Cir.2000) (when confronted with an unsettled interpretation of a state statute federal courts must "predict how the forum state's highest court would decide the issue") (citations and internal quotation marks omitted); *Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir.1994) (federal court must attempt to predict "[w]hat would be the decision of reasonable intelligent lawyers, sitting as judges of the highest New York court, and fully conversant with New York jurisprudence") (citations omitted); *Collette v. St. Luke's Roosevelt Hosp.,* 132 F.Supp.2d 256, 261 (S.D.N.Y.2001) (unsettled question under New York statute requires the court to "look[ ] to its text, read in relation to the statute as a whole, and in light of the New York Court of Appeals' interpretation [of similar] provisions"). It is to that project that the Court now turns.

## 2. *New York Law*

■ Case law from the New York Court of Appeals make plain that the City of New York, as a political subdivision of New York State, must be presumed immune from punitive damages, absent a clear statement of a contrary legislative intent. *See, e.g., Clark–Fitzpatrick, Inc. v. Long Island R R Co.,* 70 N.Y.2d 382, 386, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) ("We have held that the state and its political subdivisions are not subject to punitive damages") (internal citation omitted). In *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982), the New York Court of Appeals held that the Town of Islip was immune from a punitive damage claim arising from a child's injury in a public park. The court first noted the "axiom that a statute in derogation of the sovereignty of a State must be strictly construed, waiver of immunity by inference being disfavored." *Id.* at 336, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (citations omitted). It then found that although Section 8 of the New York Court of Claims Act explicitly waived the sovereign immunity of the State and its political subdivisions, and assumed liability "in accordance with the same rules of law as applied in actions ... against individuals and corporations," punitive damages could not "sensibly" be assessed against governmental entities. *Id.* at 336, 452 N.Y.S.2d 347, 437 N.E.2d 1104.

The court's analysis of the statute focused on the venerable public policies which have long shielded public entities from paying punitive damages:

> It would be anomalous to have the persons who bear the burden of punishment, *i.e.,* the taxpayers and citizens, constitute the self-same group who are expected to benefit from the public example which the granting of such dam-

---

plies under the New York City statute. *See, e.g., Gravatt v. City of New York,* 53 F.Supp.2d 388, 425 (S.D.N.Y.1999) ("parties do not dispute that punitive damages are not available against the City"), *rev'd on other grounds,* 226 F.3d 108 (2nd Cir.2000)

ages supposedly makes of the wrong-doer.

*Id.* at 338–39, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (internal quotation marks omitted). The court added that the "twin justifications for punitive damages—punishment and deterrence—are hardly advanced when applied to a governmental unit," *id.* at 337, 452 N.Y.S.2d 347, 437 N.E.2d 1104, and that both the New York State Constitution and various enactments of the New York Legislature presume that governmental entities remain immune from the threat paying punitive damages in civil lawsuits *See id.* at 338, 452 N.Y.S.2d 347, 437 N.E.2d 1104 ("the Legislature's enactments to this day continue to reaffirm the policy that public funds not be available, directly or indirectly, for the payment of damages beyond those actually suffered, an approach consistent with the spirit of our State Constitution") (citing N. Y Const., art VII § 8, art. VII § 9). In light of these policies, the Court found it unreasonable to infer a legislative intent to impose punitive damage liability on the State and its political subdivisions, absent an express and affirmative statutory provision authorizing such liability, which Section 8 of the Court of Claims Act was not. *See id.* at 336 n. 5, 452 N.Y.S.2d 347, 437 N.E.2d 1104 ("express legislative authorization is a precondition to governmental assumption of liability for exemplary damages") (citations omitted).

In *Clark–Fitzpatrick,* the New York Court of Appeals extended *Sharapata* to shield the Long Island Rail Road ("LIRR")—a public benefit subsidiary corporation of the Metropolitan Transit Authority—from punitive damages. Since the LIRR provided the essential public function of commuter transportation, and because the public fisc was the source of much of its funding, the court held that it must receive the same immunity from punitive damages as the State and its political subdivisions. *See Clark–Fitzpatrick,* 70 N.Y.2d at 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 ("as was the case in *Sharapata,* the imposition of punitive damages against defendant would ultimately punish only the innocent taxpayers of New York State") The court again forcefully reiterated the well-established policies that compelled the defendant's immunity from paying punitive damages for the wrongful conduct of its employees

> Although punitive damages may be appropriately imposed against a private profit-making corporation, a municipality is different because it is not organized for any purpose of gain or profit, but it is a legal creation engaged in carrying on government and administering its details for the general good and as a matter of public necessity

*Id* at 385, 521 N.Y.S.2d 653, 516 N.E.2d 190 (internal quotation marks and citations omitted). Therefore, in the absence of an explicit statutory provision to the contrary, even a municipal subsidiary corporation—like the municipality itself—is exempt from the assessment of punitive damages. *See generally* 62 N.Y. Jur.2d. *Government Tort Liability* § 11 (1999) ("The state has never shed its sovereign immunity against punitive damage claims, and the common law has traditionally rejected punitive damages against municipalities") (citing cases).

New York is hardly unique in taking this position. The policies set forth in *Sharapata* and *Clark–Fitzpatrick* are also recognized by the United States Supreme Court and the United States Court of Appeals for the Second Circuit. In *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Supreme Court held that municipalities are not liable in punitive damages for violations of § 1983 of the Civil Rights Act. Though

§ 1983 does not preclude the award of punitive damages,[13] the Court stated as a matter of law that "damages awarded for *punitive* purposes ... are ·not sensibly assessed against the governmental entity itself." 453 U.S. at 267, 101 S.Ct. 2748 (emphasis in original). In reaching its holding, the Court traced a virtually unbroken line of common-law authority to conclude that since at least the mid–1800's, courts have "viewed punitive damages [against governments] as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised." *City of Newport,* 453 U.S. at 263, 101 S.Ct. 2748. Therefore, because the principle of municipal immunity from punitive damages was "well established" when Congress promulgated the Civil Rights Act in 1871, the statute was presumed to have preserved that principle absent its express abrogation by Congress in the statute itself. *Id.* at 263, 101 S.Ct. 2748 (where a doctrine is "well established ... 'we proceed on the familiar assumption that Congress would have *specifically so provided* had it wished to abolish the [doctrine]' ") (quoting *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288

(1967) (emphasis added)); *see also id.* at 261 n. 21, 101 S.Ct. 2748 ("The general rule today is that no punitive damages are allowed unless expressly authorized by statute") (citing authorities).

Similarly, in *Ciraolo v. City of New York,* 216 F.3d 236 (2d Cir.2000), the Second Circuit just last year reversed an award of punitive damages against New York City under § 1983. Ciraolo had been awarded $15,000 in compensatory damages and $5 million in punitive damages against the City of New York for an unlawful strip search conducted pursuant to an unconstitutional policy adopted by the City's Department of Corrections. Despite an express City policy which the City "knew or clearly should have known" permitted its police officers to conduct patently unconstitutional strip searches, *id.* at 246 (Calabresi, J., concurring), the court held that "the only fair reading of [*City of Newport*] mandates a conclusion that punitive damages are not available" against municipal defendants. *Id.* at 238. No matter how deplorable the jury found the conduct of the City and its officials, under *City of Newport* and its progeny "the taxpayers themselves cannot be held responsible" for such conduct. *Id.* at 242.[14]

---

**13.** The statute provides in very general terms that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983

**14.** The same principles rejecting punitive damages against municipalities have been endorsed by the leading treatise on the law of municipal corporations, *see* E. McQuillan, *Municipal Corporations* § 53 18 10, at 247 (3d

ed.1993) ("[i]n the overwhelming majority of jurisdictions which have considered the question, it is now firmly established that exemplary or punitive damages are not recoverable unless expressly authorized by statute"), and have been applied by other district courts sitting in New York State, construing other federal statutes, *see Butler v. South Glens Falls School Dist.,* 106 F.Supp.2d 414, 421 (N.D.N.Y.2000) ("Municipal corporations are immune from punitive damages claims") (citing *Sharapata* ) (construing the Rehabilitation Act of 1973). *Graber v. City of New York,* 8 F Supp.2d 343, 348 (S.D.N.Y.1998) ("The doctrine of municipal immunity from punitive or exemplary damages is well settled") (citing *City of Newport* ) (construing the False Claims Act).

Plaintiff attempts to distinguish these cases. She correctly points out that none of them deals with the precise question of "whether the City Council *can* act to subject the City to liability for punitive damages" (Pl.'s Post–Trial Mem. at 18) (emphasis added), nor do they address whether the City Council *did* intend to do so when it promulgated the NYCHRL. That does not mean, however, that *Sharapata, Clark–Fitzpatrick, City of Newport,* and *Ciraolo* do not bear strongly on this Court's construction of the NYCHRL. For what those cases *do* establish as a matter of law, is that recovery of punitive damages against a municipality is prohibited, unless expressly authorized by statute.[15]

*Sharapata* is particularly instructive in this regard, since the Court of Appeals there dealt with a statute that expressly waived sovereign immunity to permit municipalities to be sued for any and all dam-

ages available to a plaintiff at common law or elsewhere. Specifically, the court in *Sharapata* construed Section 8 of the New York Court of Claim Act, which states in plain terms that

> The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined *in accordance with the same rules of law as applied* to actions in the supreme court *against individuals or corporations,* provided the claimant complies with the limitations of this article.

Court of Claims Act § 8 (emphasis added). When the Legislature allows the State and its subdivisions to be sued just like individuals, and the well-established rules applicable to individuals include punitive damages, there is a powerful logical appeal to the argument that the statute waives the traditional immunity against punitive damages.[16] Indeed, prior to *Sharapata,* a

---

**15.** Moreover, this requirement of express authorization harmonizes *Sharapata, Clark–Fitzpatrick, City of Newport,* and *Ciraolo* with the cases upon which plaintiff relies from other jurisdictions. For in all five of the cases she cites, the court looked for, *and found,* a clear and explicit waiver of municipal and/or state immunity from the imposition of punitive damages in civil lawsuits. *See, e.g., Gares v. Willingboro Township,* 90 F.3d 720, 726 (3d Cir.1996) (New Jersey anti-discrimination statute "expressly defines the term 'employer' to include 'the State, any political subdivisions thereof, and all public officers, agencies, boards or bodies'") (construing N.J. Stat. Ann. §§ 10:5–1 to 42), *Fortner v. City of Archie,* 70 F.Supp.2d 1028, 1031 (W.D.Mo.1999) (Missouri Human Rights Act "includes among its provisions the definition of 'employer' that includes 'the state, or any political or civil subdivision thereof'") (construing Mo. Ann. Stat. § 213.010); *Bain v. City of Springfield,* 424 Mass. 758, 678 N.E.2d 155, 159 (1997) (Massachusetts anti-discrimination statute expressly includes "'Commonwealth and all political subdivisions thereof' [in its] definition of persons and employers subject to the statute") (construing Mass.G.L. ch. 1518); *Pater-*

*son v. State,* 128 Idaho 494, 915 P.2d 724, 732 (1996) (in Idaho Human Rights Act "'employer' is defined to include 'any agency of or any governmental entity within the state; and any agent of such employer'") (construing Idaho Code § 6–918); *Collier v. State,* No. Cv. 96–80659, 1999 WL 300643, *3 (Conn.Sup.Ct. May 3, 1999) (Connecticut Fair Employment Practices Act expressly "defines 'employer' to include 'the state and all political subdivisions thereof'") (construing Conn. Gen.Stat. § 46a–60). Notably, as well, all of these cases involve action of the state legislature itself, none construes a local ordinance to waive municipal immunity from punitive damages

**16.** Moreover, the underlying facts of *Sharapata* presented a classic case for the award of punitive damages under New York law As the lower court opinion set forth in detail, the plaintiff was a twelve-year-old child who lost his footing and plunged off a ten-foot slide at a public park, sustaining disfiguring injuries to his lower back and spine. *See Sharapata v. Town of Islip,* 82 A.D.2d 350, 441 N.Y.S.2d 275, 276–78 (2d Dep't), *aff'd* 56 N.Y.2d 332, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982). The record revealed that at least ten months

state judge reading the same text concluded that "to hold that the state of New York is not subject to an award for punitive damages is to impress a judicial limitation upon the clear and unequivocal language of the Legislature." *Hayes v. State*, 80 Misc.2d 498, 363 N.Y.S.2d 986, 994 (N.Y.Ct.Cl.1975) (construing Court of Claims Act § 8), *rev'd on other grounds*, 50 A.D.2d 693, 376 N.Y.S.2d 647 (3d Dep't 1975).[17] Nevertheless, New York's highest court rejected that reading, and insisted that a more specific statement than what the legislature provided in the Court of Claims Act is required before a municipality may be held liable for punitive damages.

Moreover, *Sharapata*'s powerful expression of New York's settled common-

---

earlier, the defendant municipality had been warned by its insurer and others that the slide was defective, and that the slide had already caused at least three falls similar to the one suffered by the plaintiff Specifically, the municipality had been warned that the slide was missing a handrail, that its steps and top surface had been "warn smooth and required resurfacing," that there were missing bolts causing the slide to become unstable, that "there were numerous sharp edges" turned inward towards the slide's chute, and that the chute itself had been "cracked more than half way through." *Id.* 276–77. Despite these warnings, the municipal defendant took no action to remedy the defective conditions or to remove the slide from the park, where children would naturally be drawn to it. Under New York common law, these facts—demonstrating a failure to remedy an unreasonably dangerous condition despite actual notice—would be sufficient to state a claim for punitive damages. *See, e.g., Home Ins. Co. v. Am. Home Prods. Corp.*, 75 N.Y.2d 196, 203, 551 N.Y.S.2d 481, 550 N.E.2d 930 (1990) (punitive damages permissible under New York law where conduct, though not intentional, is alleged to constitute "wanton negligence or recklessness") (citations omitted) Presumably, therefore, on a plain reading of the Court of Claims Act, one might reasonably conclude the New York Legislature intended that punitive liability should apply to local governments on such egregious facts. Nevertheless, the Appellate Division and the New York Court of appeals definitively held that "the waiver of sovereign immunity effected by section 8 of the Court of Claims Act does not permit punitive damages to be assessed against the State or its political subdivisions." *Sharapata*, 56 N.Y.2d at 334, 452 N.Y.S.2d 347, 437 N.E.2d 1104.

**17.** Other portions of the court's decision in *Hayes* shed light on how the New York Court of Appeals would interpret the NYCHRL.

The *Hayes* court further reasoned from a plain reading of the Court of Claims Act that

> when the Legislature wrote "The state hereby waives its immunity from liability and action," it made a ringing declaration of a far reaching public policy which should not be circumscribed by judicial fiat. It seems crystal clear to this court that, under a factual situation which would support punitive damages against a private corporate body, such damages may be awarded against a public corporate body, be it the State of New York, a municipality, or an Authority.

363 N.Y.S.2d at 994 (quoting Court of Claims Act § 8) (internal citation omitted). This is essentially the same argument made by the plaintiff here as to how this Court should interpret the NYCHRL. (Pl.'s Post–Trial Mem. at 17) ("it is not for the courts to substitute their own judgment for those of the elected members of the City Council"). Unfortunately for the plaintiff, it is also the same argument that the New York Court of Appeals emphatically rejected in *Sharapata*. And it is a prediction of what the New York Court of Appeals would do, not this Court's "own judgment," that controls the interpretation of the NYCHRL in this case. Accordingly, without any indication that the New York Court of Appeals would apply a looser construction to the NYCHRL than it did to the Court of Claims Act, this Court is bound by the same principles of construction heretofore established by that court in *Sharapata* and *Clark–Fitzpatrick*. As expressed by Judge Learned Hand, it is not "desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary its duty is to divine, as best it can, what would be the event of an appeal in the case before [it]" *Spector Motor Serv. v. Walsh*, 139 F.2d 809, 823 (2d Cir.1943) (Hand, J. dissenting)

law presumption that municipalities are immune from punitive liability is consistent with the New York Legislature's more general mandate that statutes in derogation of the common law receive a strict construction. *See* McKinney's Cons.Laws of . N.Y., Book 1, Statutes ("N.Y.Stat.") § 301(a) ("Generally, statutes in derogation of the common law receive a strict construction"); *id.* § 301(b) ("The common law is never abrogated by implication, but on the contrary it must be held no further changed than the clear import of the language used in a statute absolutely requires").

These provisions create a strong presumption that all New York legislation (state and local) is promulgated against a background of common-law adjudicatory principles, and that courts must therefore tread carefully when asked to interpret any statute in derogation of a common-law rule:

> The judges sometimes doubt the wisdom of this adherence to the common law, yet the rule is firmly established. As was stated by the [New York Court of Appeals] in one case, "However much modern judges might sometimes be inclined to doubt the beneficial results to be derived from an always strict adherence to the rule, grounded upon some possible doubts ... of the common law, or of its being without exception the perfection of human reasoning in any other than a very narrow, technical, and one-sided way, yet the rule itself is too securely and firmly established and grounded in our jurisprudence to be altered other than by legislative interference."

N.Y. Stat. § 301(a) (Comment) (quoting *Fitzgerald v. Quann,* 109 N.Y. 441, 445, 17 N.E. 354 (1888)). *See also Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 109, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("where a common law principle is well established, ... the courts may take it as a given that [the legislature] has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident"). New York courts are further counseled never to infer that a statute derogates from the common law absent a clear and explicit statement in the text that such derogation was intended by the legislature:

> The common law is never abrogated by implication.... Where a change in the common law is to be effectuated, the legislative intent to do so must be clearly and plainly expressed.... *If a statute admits of two interpretations, that which more nearly conforms to the rules of the common law is to be adopted.*

*Id.* § 301(b) (Comment) (emphasis added).

The New York Court of Appeals consistently follows this canon of strict construction. *See, e.g., Oden v. Chemung County Indus. Dev. Agency,* 87 N.Y.2d 81, 86, 637 N.Y.S.2d 670, 661 N.E.2d 142 (1995) (statute in derogation of the common law "is to be construed in the narrowest sense that its words and underlying purposes permit") (citing N.Y. Statutes § 301(b)); *Morris v. Snappy Car Rental, Inc.,* 84 N.Y.2d 21, 614 N.Y.S.2d 362, 637 N.E.2d 253 (1994) ("It is axiomatic concerning legislative enactments in derogation of common law, and especially those creating liability where none previously existed, that they are deemed to abrogate the common law only to the extent required by the clear import of the statutory language") (citing *Psota v. Long Island R R Co.,* 246 N.Y. 388, 393, 159 N.E. 180 (1927)); *Arbegast v. Bd. of Educ. of South Berlin,* 65 N.Y.2d 161, 169, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985) ("The Legislature is ... presumed to be aware of the decisional and statute law in existence at the time of an enactment, and to have abrogated the common

law only to the extent that the clear import of the language used in the statute requires") (internal quotation marks and citations omitted); *see also Wisholek v. Douglas*, 280 A.D.2d 220, 722 N.Y.S.2d 316, 319 (4th Dep't 2001) ("Statutes that seek to abolish common-law rights must be strictly construed, and the common law must be 'no further changed than the clear import of the language used in a statute absolutely requires'") (quoting N.Y. Stat. § 301(b)). Indeed, the Court of Appeals invoked this very principle in *Sharapata*: "[N]ot the least of the legal propositions of which we here cannot lose sight is the axiom that a statute in derogation of the sovereignty of a State must be strictly construed." 56 N.Y.2d at 336, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (citations omitted). There is every indication that the court would do the same were it asked (as plaintiff asks this Court to do) to construe the NYCHRL to abrogate New York

City's common-law immunity from punitive damages.

Accordingly, this Court can predict with some certainty that the New York Court of Appeals would read the NYCHRL to preserve the City's common-law immunity from punitive damages absent a clear and plainly expressed statement, within the statute itself, of a contrary legislative intent. Therefore, before construing the NYCHRL to authorize the award of punitive damages in this case, the Court must find there an unequivocal expression of legislative intent.[18] For the following reasons, both the text and legislative history of the NYCHRL falls short of this standard.

### 3. *Applied to the NYCHRL*

#### a. *Text*

■ As it must with any issue of statutory interpretation, the Court begins with

---

**18.** This discussion presumes that the New York City Council has the power to waive the City's immunity from punitive damages, which—although neither party seriously addresses the issue—is by no means certain. The New York Court of Appeals suggested in *Sharapata* that policies shielding municipalities from punitive damages are embedded in the New York State Constitution. *see Sharapata*, 56 N.Y.2d at 338, 452 N.Y.S.2d 347, 437 N.E.2d 1104, and has since held explicitly that where the NYCHRL and State Constitution conflict, the former must yield. *See Matter of Beame v. DeLeon*, 87 N.Y.2d 289, 297, 639 N.Y.S.2d 272, 662 N.E.2d 752 (1995) ("The salutary purposes of New York City's Human Rights Law to combat and remedy the results of gender-based discrimination in employment must, of course, give way to the higher law of the State Constitution"). While *Sharapata* makes clear that "express legislative authorization is a precondition to governmental assumption of liability for exemplary damages," 56 N.Y.2d at 336 n. 5, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (citations omitted), it is by no means certain that individual municipalities, or even New York City with its formidable home rule powers, *see, e.g.,* McKinney's Municipal Home Rule Law

§ 10, *et seq.,* have the power unilaterally to waive such a strong presumption under state law. *See, e.g., DJL Rest. Corp. v. City of New York*, 96 N.Y.2d 91, ——, 725 N.Y.S.2d 622, ——, 749 N.E.2d 186, 2001 WL 301925, at *1 (N.Y.2001) ("the Municipal Home Rule Law prohibits the City from adopting local laws inconsistent with the State Constitution or any general law of the State") (citations omitted). Because, as is concluded below, the NYCHRL is most persuasively read not to attempt such a waiver, the Court need not address the extent of the City's powers in this instance—a question of the structure of state government much better left to the courts of New York itself. Nor, for the same reasons, does the Court need to consider the constitutional challenges raised by the City pursuant to the "gift" provisions of the New York Constitution. (Defs.' Post–Trial Mem. at 17–21.) Nevertheless, the constitutional doubt is another factor supporting the City's construction of the NYCHRL in this case. *See, e.g., In re Matter of Jacob*, 86 N.Y.2d 651, 667–68, 636 N.Y.S.2d 716, 660 N.E.2d 397 (1995) (state and local laws must be construed so as to avoid any doubt regarding their constitutionality under state law).

the text of the statute. *See, e.g., Collette,* 132 F.Supp.2d at 262 (citing *United States v. Piervinanzi,* 23 F.3d 670, 677 (2d Cir. 1994)). Plaintiff's textual argument is essentially a four-step process of inference. She asks the Court to conclude that because the statutory definition of "person" includes "governmental bodies and agencies" (§ 8–102(2)); because the definition of "a covered entity" includes "a person" (§ 8–102(17)); because a "covered entity" must comply with Section 8–107 (*id.*); and because the remedy for violations of Section 8–107 include punitive damages (§ 8–502(a)), it follows that the City Council intended that "governmental bodies and agencies" could be made to pay punitive damages for violations of Section 8–107 (Pl.'s Post–Trial Mem. at 13–15.)

This is hardly a frivolous argument. The City appears to concede that the NYCHRL provides the City's employees with a cause of action at least for compensatory damages. (Defs.' Post–Trial Mem. at 8–17.)[19] While the City does not explain what statutory language leads to this conclusion, it must be by reasoning quite similar to the plaintiff's argument for punitive damages. Section 8–502(a) does not distinguish between compensatory and punitive damages; it simply provides that a person "aggrieved by an unlawful discriminatory practice," including employment discrimination in violation of § 8–107(1)(a), "shall have a cause of action ... for damages, including punitive damages." If the City is subject to suit under this section, it would appear to follow that it is subject to liability for both compensatory and punitive damages.

But under the interpretive principles discussed above, appearances of abrogation are insufficient to subject the City to *punitive* liability. It is not at all surprising that the City would want to remedy discrimination against its own employees with a right of action for compensatory damages. Commentators note that the trend over the past fifty years has been away from municipal immunity for compensatory damages. *See generally* W. Keeton, D. Dobbs, R. Keeton, & D Owen. *Prosser & Keeton on Law of Torts,* § 131, pp. 1032–33, 1051–1056 (5th ed.1984) (discussing the general abandonment and limitation of municipal immunities in the period since World War II), *Restatement (Second) of Torts* § 895C (1977) (recognizing the rule that municipalities are no longer generally immune from tort liability). The NYCHRL, reasonably interpreted, is in keeping with that trend. It sets forth a rather comprehensive set of protections against unequal treatment, based on a very broad policy against "prejudice, intolerance, bigotry, and discrimination." § 8–101. It is hardly likely that the legislative body that enacted such a comprehensive statute would have condoned em-

---

**19.** The Court is aware of no instance in which the City has contested its liability for compensatory damages for violations of § 8–107 the NYCHRL Because it is settled that the City is liable for similar conduct under the New York State Human Rights Law, and federal provisions such as Title VII and § 1983, this too is not surprising. *See, e.g., Menes* 92 F.Supp.2d at 307 (applying same standard under State Executive Law, City Administrative Code, and § 1983 Equal Protection Clause); *Mohamed v. Marriott Int'l, Inc.,* 905 F.Supp. 141, 157 (S.D.N.Y.1995) (Sweet, J.) ("The wording of the city ordinance and the manner in which it has been applied show a clear intent to parallel the obligations and the remedies provided by the State of New York and the United States") The only situation in which the City's liability under the NYCHRL would appear to have some consequence (other than overlapping compensatory liability) is where, as here, a party seeks punitive damages, which are not available under parallel state and federal provisions, under the NYCHRL. *See, e.g., Walsh v. Covenant House,* 664 N.Y.S.2d at 283 (federal, state, and city civil rights laws "differ only in that the City law allows for the recovery of punitive damages")

ployment discrimination by the City itself. But a private right of action against a municipality for punitive damages is a different proposition, requiring different (and far more demanding) interpretive presumptions. For despite the trend towards broader municipal liability for compensatory damages, the "overwhelming majority of jurisdictions" have "firmly established" that municipalities are still immune from punitive liability. McQuillan, *Municipal Liability* § 53.18.10; *see also Sharapata*, 82 A.D.2d 350, 441 N.Y.S.2d 275, 283 (2d Dep't ), *aff'd* 56 N.Y.2d 332, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (1982) ("Although many statutory and other inroads upon the doctrine of sovereign immunity have been made, the levying of punitive damages against a public entity is not favored, since to do so would impose an unjust burden upon the innocent taxpayer without directly punishing the wrongdoer")

Indeed, *Sharapata* itself defeats with some resound the argument that legislation subjecting a municipality to a remedial scheme that on its face permits punitive damages—even a statute (unlike the NYCHRL) whose very purpose is expressly to abrogate the sovereign immunity of all governmental entities—automatically serves as a waiver of the municipality's immunity from such damages. However logical the argument that such legislation necessarily reflects a legislative decision to subject the municipality to punitive damages liability, New York law clearly requires more. Therefore, it is this Court's conclusion that were the New York Court of Appeals ever to pass on plaintiff's construction of the NYCHRL, it would not (and could not) find here what it required of the Court of Claims Act in *Sharapata* "express legislative authorization" of municipal liability for punitive damages within the statutory text. 56 N.Y.2d at 336 n. 5, 452 N.Y.S.2d 347, 437 N.E.2d 1104. The NYCHRL simply does not state, in the clear and simple terms that *Sharapata* requires, that "the City of New York, notwithstanding any other rule of law, shall be liable for punitive damages for violations of this law" Nor does anything cited by the plaintiff approach such clarity.

Plaintiff first points out that the definition of "person" in § 8–102(1) of the NYCHRL specifically does include "governmental bodies or agencies." Many provisions of the statute use the term "person," which thus unambiguously includes the City itself, in defining the scope of coverage. For example, the public accommodations provisions of the statute, § 8–107(4), prohibits discrimination by "any person" who owns or operates various places of public accommodation; the prohibition on discriminatory lending applies to "any person, bank, trust company, [etc.]," § 8–107(5)(d), any "person" involved in the business or real estate appraisal is prohibited from discrimination, § 8–107(5)(f); "person[s]" are prohibited from aiding and abetting violations, retaliating against those who complain of discrimination, or discriminating in certain ways on the basis of someone's criminal record, §§ 8–107(6), (7), (10); and so on. Therefore, there is no question that City is meant to comply with the NYCHRL at least in some instances.[20]

When it comes to employment discrimination, however, the only "person" identified in the relevant provision is not the party made liable for unlawful discrimination, but rather the aggrieved party empowered to bring suit to remedy it. *See* § 8–107(1). The party against whom a "person" may bring suit for unlawful dis-

---

**20.** Moreover, since violators of these provisions are also subject to punitive damages under § 8–502(a), it is arguable that the text contemplates punitive damages against the City for violations of these provisions

crimination, is an "employer," which, as noted above, is left generally undefined. *Id.*[21] Similarly, the only "person" mentioned in Section 8–502, which provides for a private right of action, and which is the only provision to mention punitive damages, is the party "claiming to be aggrieved by an unlawful discriminatory practice," not the party against whom such a person may bring a suit for "for damages including punitive damages." *Id.*

Whether or not these provisions are sufficient to subject the City to compensatory liability for employment discrimination (which the City does not contest and the Court therefore assumes), what ultimately dooms any argument that the City is concomitantly liable for punitive damages is that the *only* express reference in the NYCHRL to "governmental bodies and agencies," occurs in the definition of this single term ("person"), which is used in the relevant substantive and remedial sections to reference only the party empowered to bring suit, not the party to be sued. *See* § 8–107(a); § 8–502(a). Given the inter-

pretive principles of New York law which prohibit a liberal or creative reading of local statutes promulgated in derogation of the common law, it would be unreasonable for this Court to suppose that the City Council intended to divest the City of immunity from punitive damages by way of such an oblique reference.

Plaintiff urges, however, that all "persons" are included in the definition of "covered entity" in § 8–102(17). But this too does not carry the day. For the definition of "covered entity" does not purport to be an operational section of the statute that explains the scope of its substantive provisions—it is not, for example, a provision that says, "The following types of entities are required to comply with this Act." Rather, the provision, which was added in 1991, simply defines a term, used at certain places in the statute, according to the legislative history, "for ease of reference to persons who are required to comply with the provisions of § 8–107." Council of the City of New York, Report of the Legal

---

**21.** Perhaps the strongest textual argument for the plaintiff is the simplest and most direct (yet not the principal focus of her papers): that the City counts as an "employer," prohibited from sex discrimination by § 8–107(1)(a), and thus subject to suit for compensatory and punitive damages by "any person claiming to be aggrieved" under § 8–502(a). But the City Council failed even explicitly to include "governmental bodies or agencies" in the critical definition of "employer," a silence which (1) hardly suggests that the legislators focused on the consequences for the City in being subjected to punitive damages, and (2) distinguishes the NYCHRL from the statutes construed in the cases cited by the plaintiff. *Compare Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("unmistakably clear" waiver of sovereign immunity where federal statute explicitly "authorizes employees to maintain actions for backpay 'against any employer (including a public agency) in any Federal or State court of competent jurisdiction'" and "public agency" is in turn defined to include "'the govern-

ment of a State or political subdivision thereof [and] any agency of ... a State, or a political subdivision of a State'") (quoting Fair Labor Standards Act, 29 U.S.C. § 626(b) & (x)); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (holding that Congress made its intent to abrogate state sovereign immunity explicit when it amended Title VII's definition of "person engaged in an industry affecting interstate commerce" to include "governments, governmental agencies [and] political subdivisions," and simultaneously amended the definition of "employee" to include individuals "subject to the civil service laws of a State government, government agency, or political subdivision") (quoting 42 U.S.C. § 2000e(a) & (b) & (f)). Moreover, even a reading of "employer" as ordinarily understood, which would clearly render the City liable for compensatory damages for discriminatory treatment of its employees, still would fall short of the kind of express statement of authority for *punitive* liability contemplated by the New York Court of Appeals in *Sharapata*

Division, *contained in* Legis. Bill Jacket, Local Law, 1991, No 39 of City of New York ("Bill Jacket") As noted above, the term does not appear at all in the sections relevant to this action Indeed, it appears only in two places in the statute first, in provisions relevant to discrimination based on disability, §§ 8–107(15), 8–102(18); and second, in provisions related to findings of discrimination based on disparate impact, § 8–107(17) These provisions were also added in 1991, and the term "covered entity" was apparently invented as a shorthand way of applying the new requirement of reasonable accommodation of persons with disabilities, and the new prohibition on practices causing unjustified disparate impact on protected classes under the statute, to employers, employment agencies, labor organizations, and any other of the types of entities specifically discussed in the pre-existing subsections of § 8–107.

Thus, the fact that the term "covered entity" includes any "person" required to comply with § 8–107, and that "person" in turn includes governmental bodies, does not mean that governmental bodies are necessarily included as "employers," let alone that governmental bodies are necessarily liable for punitive damages under the statute. As noted above, "person[s]," including "governmental bodies," are explicitly included in numerous provisions of § 8–107; to the extent that they are, they are "covered entities" and thus the disability discrimination and disparate impact provisions of the statute apply to them as well. Because § 8–107(1)(a) applies to "employers," any "employer" is a "covered entity." But to argue that since any kind of "person" can be a "covered entity," any type of "person" must be an "employer" is illogical; to argue that the City Council has thereby given *express* authorization for holding any type of "person" liable for punitive damages, is to go yet another step further.

Moreover, even if there were some logic to the plaintiff's attenuated construction of "covered entity," it would be all the more unreasonable to infer that the City Council intended to accomplish a profound change in the common law by implanting the term "person" in a definition—buried, no less, in the seventeenth paragraph of the NYCHRL's twenty-two paragraph definitional subsection—of yet another term ("covered entity"), which does not appear at all in the statute's critical substantive and remedial passages. Indeed, no reader of the statute would have any reason at all to reference such an insular definition when construing the only substantive provisions relevant to this case. *See, e.g., Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (clear statement rules require statement of legislative intent that is "plain to anyone reading the Act").

Finally, and perhaps most devastating to the plaintiff's construction, § 8–502(a) of the NYCHRL, the only provision to mention punitive damages, begins with the proviso: "Except as otherwise provided by law." *Id.* There is no question that when the NYCHRL was promulgated in 1991, municipal immunity from punitive damages was "otherwise provided by law" in New York State and elsewhere. *Sharapata* (1981), *Clark–Fitzpatrick* (1987), and *City of Newport* (1983), had all been decided well before then. And the City Council is presumed to have been aware that, as the New York Court of Appeals noted in *Sharapata,* since at least 1902, New York courts have consistently construed general waivers of municipal immunity to preserve the principle that governmental entities remain immune from punitive liability. *See Sharapata,* 56 N.Y.2d at 336, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (citing *Costich v. City of Rochester,* 68 A.D. 623, 73 N.Y.S. 835, 841 (4th Dep't 1902) ("[t]here

are reasons, whether we seek to designate them by that very general term, 'public policy,' or otherwise, which oppose the application of the doctrine of punitive damages to municipal corporations")). The City Council is also presumed to have been aware of *Sharapata's* dictum that the New York Constitution disfavors municipal liability for punitive damages. *See id.* at 338, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (citing N Y. Const. art. VII, § 8, art. VIII, § 9).

These interpretive presumptions—that the City Council legislated against a backdrop of long-standing and notorious principles of the common law—give Subsection 8–502(a)'s proviso "[e]xcept as otherwise provided by law" particular force in this case. *See, e.g., Juarez v. Wavecrest Mgt. Team, Ltd.,* 88 N.Y.2d 628, 646, 649 N.Y.S.2d 115, 672 N.E.2d 135 (1996) ("we must presume that the City Council was aware of the common-law rule and abrogated it only to the extent indicated by the clear import of its enactment") (citations omitted). At the very least, the proviso renders the NYCHRL amenable to a construction that preserves the City's common law immunity from punitive liability, which is sufficient in itself to doom plaintiff's argument for a broader reading. *See, e.g., People v. King,* 61 N.Y.2d 550, 554, 475 N.Y.S.2d 260, 463 N.E.2d 601 (1984) ("if the terms of a statute are subject to two interpretations, *that which most comports with the common law should be adopted"*) (citations omitted) (emphasis added). The statute, in other words, permits aggrieved persons to sue private defendants for punitive damages and the City itself for compensatory damages, since such actions are not otherwise prohibited, but not to sue the City for punitive damages, since state law, at least absent a more express statement by a competent legislature, provides otherwise.

This Court's interpretation of the NYCHRL is constrained, moreover, not only by the principles expressed so clearly by the New York Court of Appeals in *Sharapata,* and the New York Legislature in N.Y. Stat. §§ 301(a) & 301(b); but also by venerable principles of comity within our federal system. Before any federal court may hold as a matter of first impression that a municipality has intentionally divested its immunity from punitive damage liability, the local legislature must have spoken with a clearer voice, and in more precise terms, than the New York City Council has done here. As stated by the Supreme Court: "In traditionally sensitive areas such as [waivers of governmental immunities], the requirement of a clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Astoria Fed. Sav. & Loan Ass'n,* 501 U.S. at 109, 111 S.Ct. 2166 (quoting *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)), *see generally* Richard H. Fallon, Daniel J. Meltzer & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 1222–30, 1256–75 (4th ed.1996) (discussing how "doctrines of equity, comity, and federalism" affect the exercise of federal court jurisdiction). That is wise counsel in this case. For the text of the NYCHRL fails to convince the Court that the New York City Council "has in fact faced, and intended to bring into issue," the question of whether the City itself should be liable for punitive damages under the NYCHRL.

For all of these reasons—(1) the term "employer" does not expressly include governmental entities, (2) the term "person" includes governmental entities but is not referenced in relation to a party made liable for punitive damages, (3) the term "covered entity" is oblique and renders little if anything express, and (4) the only

statutory provision referencing punitive damages includes a proviso which is reasonably read to incorporate the authority that shields New York municipalities from punitive liability—the text of the NYCHRL does not unambiguously support plaintiff's claim for punitive damages in this case. Governing interpretive presumptions articulated by the New York Court of Appeals in like cases, as well as the compelling public policies underlying municipal immunity from punitive damages, and the State of New York's deeply-rooted traditions of such immunity, simply forbid authorization for punitive municipal liability by way of the indirect construction that would be necessary to connect the City to the punitive damage provision of Section 8–502.

### b. *Context and Legislative History*

The context and legislative history of the 1991 amendments to the NYCHRL, which first enacted the private right of action and its punitive damages provision, confirm this conviction. The fiscal consequences of exposing the City and other governmental bodies to punitive damages have been a significant concern for courts that have addressed the issue.[22] There is no question that threats of large punitive damage judgments would inhibit the City Council's

future decision making processes and alter its budgetary allocations. *See, e.g.,* James R. Hackney, Jr., *A Proposal of State Funding for Municipal Tort Liability,* 98 Yale L.J. 389, 389 (1988) (noting that some municipalities have had to forego liability insurance and face the risk of bankruptcy due to increased municipal insurance premiums). Of course, if the legislature decided to bear those costs, it would not be for a court to second-guess that decision. But one would expect that a legislature that was making a conscious decision to waive a long-standing common-law rule and thereby incur significant potential liabilities would leave some evidence that it had considered the potential costs of doing so.

These costs, moreover, would inure not only to the City, but also to other governmental entities operating within the geographical boundaries of New York City— such as the New York City Transit Authority, the New York City Housing Authority, or the New York City Health and Hospitals Corporation. Given the importance of housing the poor, providing medical care for needy, and operating safe and reliable transportation, and the limited operational budgets of municipal agencies such as these,[23] one would expect some

---

**22.** In *City of Newport,* the Supreme Court expressed its concern for the financial integrity of municipal agencies made liable for punitive damages:

> punitive damages imposed on a municipality ... are likely accompanied by an increase in taxes or a reduction of public services footing the bill.... [M]unicipalities and other units of state and local government face the possibility of having to assure compensation for persons harmed by abuses of governmental authority covering a large range of activity in everyday life. *To add the burden of exposure for malicious conduct of individual government employees may create a serious risk to the financial integrity of these governmental entities.*

*Id.* at 266–67, 270, 101 S.Ct. 2748 (emphasis added).

**23.** *See, e.g., Civic Ass'n of the Deaf v. Giuliani,* 915 F.Supp. 622, 633 (S.D.N.Y.1996) (New York City Fire Department "suffer[s] tight fiscal constraints"); *Matter of Tenants' Union of West Side v. Beame,* 40 N.Y.2d 133, 138, 386 N.Y.S.2d 83, 351 N.E.2d 731 (1976) (interpreting local ordinance in light of "the limited operational budget with which the [New York City Rent Control Agency] has to work") (construing New York City's Rent and Rehabilitation Law); *Ulloa v. City of New York,* 193 A.D.2d 487, 597 N.Y.S.2d 386, 387 (1st Dep't 1993) (recognizing the "serious personnel shortages and budgetary constraints in the Corporation Counsel's office"); *Matter of Di-*

record of legislative debate about the wisdom of subjecting them to potentially serious new liabilities based on the conduct of their employees.

Similarly, though the City's recent prosperity may have dimmed memories of it, the City was in the midst of a perilous fiscal crisis when the NYCHRL amendments creating the private right of action were passed in May 1991, and went into effect in November 1991. *See, e.g.,* Sam Roberts, *More than Just Another Fiscal Crisis,* New York Times, Nov. 17, 1991, at A1 ("New York City and state are suffering from chronic budgetary crises"). During the very month the amendments were passed, members of the City Council proposed a state constitutional amendment barring jury trials for negligence suits filed against the City, in order to *reduce* the City's projected liabilities from damage actions. *See* Robert Tomsho and Milo Geyelin, *Ban on Jury Trials in Suits against New York City to be Proposed,* Wall Street Journal, May 2, 1991, at B8 The City's Corporation Counsel supported the proposal on grounds that "inappropriate jury verdicts" were "eating away at the City treasury" *Id.* Given that political climate, it would be astonishing if the Council had made a deliberate decision to expose the City to unprecedented *new* liabilities without debate.

Yet the legislative history of the NYCHRL gives no indication that any such matters were ever considered (even peripherally) by the City Council. Contemporary press accounts disclose not one iota of evidence that the City Council ever discussed or debated the pros and cons of divesting the City's immunity from punitive damages under the NYCHRL.[24] More significantly, the City Finance Division's Fiscal Impact Statement, included in the Bill Jacket accompanying the NYCHRL, considers in some detail the costs and consequences of administering the new law, without any mention of the costs inherent in subjecting municipal agencies to the threat of multi-million dollar punitive damage awards. *See* Report of New York City Finance Division, *Fiscal Impact Statement,* June 3, 1991, *contained in* Bill Jacket.

Nor, for that matter, does anything in the committee reports accompanying the amendments reflect the slightest intent to subject the City itself to punitive damage awards, nor any recognition that doing so would change the status quo. The principal report contains not only a narrative discussion of the purposes of the legislation, but also an elaborate section-by-section analysis of the effects of the amendments, and a lengthy comparison of the law on various topics before and after the amendments. *See* Council of City of New

---

rector *(Bodek),* 159 Misc.2d 109, 603 N.Y.S.2d 676, 677 (1993) (recognizing the "severe budget constraints that New York City labors under."); *see also Shifa Servs., Inc. v. Port Auth. of New York & New Jersey,* No. 96 Civ. 1361(AGS), 1997 WL 563301 at *5 (S.D.N.Y. Sept. 8, 1997) (holding that the Port Authority, as a quasi-governmental agency, is immune from punitive damages because "an award of punitive damages might result in increased tolls, fares, and other expenses born by the public generally"); *Recreation World, Inc. v. Port Auth. of New York & New Jersey,* No. 96 Civ 5549(LAP), No. 97 Civ. 5029(LAP), 1998 WL 107362 at *12 (S.D.N.Y. March 9,

1998) (reasoning that "it is doubtful that financial damages that can easily be passed on to the public would in fact deter the individuals responsible for the violations")

**24.** *See, e.g.,* William Murphy, *Civil Rights Bill Had Lone Opposition,* Newsday, June 10, 1991, at 22 (noting that only one councilperson voted against the measure—on grounds having nothing to do with punitive damages—and that most of those "who voted for the legislation did not even bother to make a speech for the record")

York, *Report of the Legal Division, contained in* Bill Jacket. These materials contain significant discussion of the value of allowing private civil actions against those who violate the NYCHRL, and make explicit that punitive damages are among the remedies provided. *Id.* But nowhere is there any indication that the City itself might be among those violators, that punitive damages might therefore be available against it, or that exposing the City to such liability would constitute a departure from clear state law.

While such omissions do not bind this Court's interpretation of the NYCHRL, they confirm the conclusion, reached above from the text of the statute, that the New York Court of Appeals would not read NYCHRL to satisfy the clear statement rule announced in *Sharapata.* Indeed, that court gave substantial weight to a similar lack of legislative interest when construing the Court of Claims Act to preserve government immunity from punitive damages. The court first noted that "the formal history which accompanied this seemingly straightforward statute at the time of its adoption is sparse." 56 N.Y.2d at 336, 452 N.Y.S.2d 347, 437 N.E.2d 1104. Then, upon reviewing what little formal history did exist, it concluded that "though it ... is hard to believe that any attempt to include punitive damages would not have induced lively legislative debate, contemporary State history preceding the formulation of Section 8 gives no indication that the matter ever evoked any legislative interest." *Id.* at 338, 452 N.Y.S.2d 347, 437 N.E.2d 1104 The parallels to the NYCHRL, as set forth above, are striking. There is simply no evidence, in the text of the statute or in the legislative history attending on its adoption, that the City Council made a conscious decision to strip the City and its agencies of their traditional immunity from punitive damages liability.

### 4. *Conclusion*

For all of the foregoing reasons, the Court concludes that punitive damages are not recoverable against the City under the NYCHRL. The City's motion for judgment as a matter of law with respect to the jury's award of $1 million in punitive damages is therefore granted.

### B. *Statute of Limitations*

Both defendants next renew their argument, first made on the fifth day of trial (Tr. 700–703), that this entire lawsuit should be dismissed on grounds that plaintiff failed to demonstrate any instances of sexual harassment within the three-year statute of limitations period applicable under both § 1983, and the New York State Human Rights Laws. (Defs.' Post–Trial Mem. at 6–7.) Since the complaint was filed on July 28, 1995, the harassment of which Katt complained would have to have continued past July 28, 1992 to be actionable. Defendants point out that Katt's testimony was generally vague on the matter of dates, and that she did not in fact identify the exact date of any of the events to which she testified. (*Id.* at 6–7.) Moreover, they point out that her last day of work for the NYPD, before the extended absence that led to her firing, was August 16, 1992, and contend, by an analysis of her and DiPalma's regular days off and Katt's attendance records, that the two were together at the Seventh Precinct only for approximately seven days during that window. (*Id.*) Accordingly, they claim that Katt failed to provide any evidence that DiPalma's actions occurred within the limitations period, and that they are therefore entitled to judgment as a matter of law (*Id.* at 7.)

The Court rejected this claim at trial pursuant to Rule 16(e) of the Federal

Rules of Civil Procedure, on grounds that the defendants had waived it when they failed to include any mention of the applicable statutes of limitations, or the facts relating thereto, in the JPTO submitted to the Court on February 13, 2001, or at the final pretrial conference held on February 16, 2001. (Tr. 858–65.) The Court further declined to exercise its limited discretion to modify the Joint Pretrial Order in the midst of trial. (*Id.*) For the following reasons, the Court adheres to these rulings.

1. *Rule 16(e)*

Rule 16(e) of the Federal Rules of Civil Procedure provides:

> After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

Fed.R.Civ.P. 16(e). Similarly, this District's Local Civil Rule 16.2(a) provides that a joint pretrial order "when signed and filed in the Clerk's Office, becomes an Order of the Court, superseding the pleadings and governing the course of trial unless modified by further Order."

Pursuant to these rules "[i]t is an established procedural principle that a party's failure to include a legal theory or defense in the pre-trial order results in its subsequent abandonment or waiver." *Colli v. Wirth*, No. 94 Civ. 3234(LBS), 1996 WL 442835, at *1 (S.D.N.Y. Aug. 6, 1996) (citations omitted). *See also Gowan v. United States Dep't of the Air Force*, 148 F.3d 1182, 1192 (10th Cir.1998) (issue not raised in pretrial order "was not part of the case before the district court"). *Aviation Dev Co. v. C & S Acquisition Corp.*, No. 97 Civ. 9302(AJP), 1999 WL 123718, *4 (S.D.N.Y. March 8, 1999) ("The Pretrial Order limits the evidence that may be presented at trial") (internal citations omitted); *MEI Int'l Inc. v. Schenkers Int'l Forwarders, Inc.*, 807 F.Supp. 979, 989 (S.D.N.Y.1992) (failure to include facts relating to statute of limitations defense in joint pretrial order waived the defense at trial).

Though district courts retain some discretion to modify a pretrial order, such discretion is limited to cases in which modification would "insure the efficient resolution of trial and, most importantly, minimize prejudicial surprise." *Lamborn v. Dittmer*, 873 F.2d 522, 526 (2d Cir.1989) *See also McFadden v. Sanchez*, 710 F.2d 907, 911 (2d Cir.1983) ("A district court may permit modifications of a pretrial order 'to prevent manifest injustice,' though modifications should not be allowed that would seriously prejudice one of the defendants") (quoting Fed.R.Civ.P. 16(e)) (citations omitted). Finding a waiver pursuant to Rule 16(e) is particularly appropriate where (as here) a party knew or should have known of an issue that might arise at trial, yet failed to raise the issue *either* in a pretrial order *or* at the final pretrial conference. *See, e.g., Senra v. Cunningham*, 9 F.3d 168, 171 (1st Cir.1993) (district court may appropriately bar any issue that was foreseeable but not raised in a pretrial order or conference). As expressed by leading commentators:

> Though a court may permit the pretrial order to be amended when the danger of surprise or prejudice to the opposing party is small and a failure to amend might result in an injustice to the moving party .... *if the evidence or issue was within the knowledge of the party seeking modification [of the pretrial order] at the time of the [pretrial] conference ... then it may not be allowed.*

Wright, Miller & Kane, 6A *Federal Practice and Procedure*, § 1527, at 287–88 (2d ed.1990) (emphasis added) (internal cita-

tions omitted). A trial court's application of Rule 16(e) "always is viewed as a matter of judicial discretion." *HBE Leasing Corp. v. Frank,* 22 F.3d 41, 44 (2d Cir. 1994) (internal quotation marks omitted). *See also Bradford Trust Co. v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 805 F.2d 49, 52 (2d Cir.1986) ("Motions to reopen or to modify a pre-trial order are addressed to the sound discretion of the trial judge") (citations omitted).

### 2. The Rule Applied

This case could be the poster child for Rule 16(e). For defendants, notwithstanding almost six years of procedural case history, not only failed to raise the instant statute of limitations defenses in either of two joint pretrial orders, or in any pretrial conference, either of which alone would be sufficient to bar that defense at trial, but defendants then raised the issue on the fifth day of an eight-day trial by a motion for a directed verdict at the close of the plaintiff's case. A clearer case of trial by ambush is hard to imagine. If defendants believed that a statute of limitations defense could defeat all of plaintiff's claims, then that defense should have been once brought to the Court's attention at one of the legion of pretrial conferences held in this case, or raised in one of defendants' extensive pretrial submissions, including two joint pretrial orders.

Some elaboration of the procedural background discussed above is helpful to understanding the application of Rule 16(e) to this case. The case was transferred to my chambers on September 22, 2000. Trial began four months later, on February 20, 2001. In the interim, the Court allowed the parties every opportunity to raise all of their potential claims and defenses. The Court first held a pretrial conference on October 25, 2000. There,

the Court instructed the defendants to submit summary judgment papers on *any* issue that was potentially dispositive of *any* of plaintiff's outstanding claims. Defendants were further instructed to submit any papers that had previously been filed with other judges, and to supplement those papers with any materials or arguments relevant to any available defense. The Court received those papers—which were voluminous, consisting of hundreds of pages, and dozens of exhibits—on November 9. Defendants' cover letter to the Court confirmed their understanding that the submitted papers "would make their motion fully dispositive." (Letter from Jeffery S. Dantowitz to Judge Lynch of 8/20/00, at 1.) Yet no hint of a statute of limitations defense was included therein.

After granting partial summary judgment to the defendants, the Court directed that the parties submit their final joint pretrial order. This joint pretrial order was to be an amended and updated version of the joint pretrial order previously submitted to Judge Berman in August 1999 (Joint Pretrial Order, Aug. 9, 1999) The Court received the parties' revised JPTO on February 13. The JPTO listed five "defenses remaining to be tried," none of which referenced the statute of limitations. (JPTO at 2.) At the same time, the Court also received the defendants' revised Requests to Charge; they too did not reference the statute of limitations. (Defs.' Rev. Req. to Charge, February 13, 2001.) On February 16, 2001, the Court held its final pretrial conference, at which it requested, again, that all relevant issues be brought to the Court's attention. (Tr. of 2/16/2001 at 2, 31.) This conference lasted approximately four hours; there was no mention of relevant statutes of limitations, or that facts bearing thereupon might become relevant to any of plaintiff's claims at

trial.[25] The Court provided the parties with a draft of its proposed jury instructions on the first day of trial, February 21, 2001, to give them every opportunity to raise errors and omissions at their earliest opportunity. (Tr. 4.) Yet defendants raised the instant statute of limitations defense for the first time on February 26, after the plaintiff had presented her case to the jury. (*Id.* 700–701.)

### a. *No Manifest Injustice to Defendants*

■ Defendants argue that despite this procedural history, the Court abused its discretion by not permitting them to amend the JPTO to raise a statute of limitations defense in the middle of trial. (Defs.' Post–Trial Mem at 6–7) They argue that they did not raise the issue in the JPTO since it "became clear [only at] trial that the statute of limitations was . . . an issue because Ms. Katt could not remember when these things occurred and it is her burden to prove that these things occurred in certain time frames" (Tr. 862.) But to prevail on this motion, the defendants must demonstrate a "manifest injustice" resulting from the Court's ruling against them at trial. *See, e.g., Farr Man Coffee Inc. v. Chester,* No. 88 Civ. 1602(DNE), 1992 WL 316310, at *1 (S.D.N.Y. Oct. 16, 1992) ("Modifications to a pretrial order are permissible 'only to prevent manifest injustice' ") (quoting Fed. R.Civ.P. 16(e)). That they cannot do. As the Court noted on the record, defendants

vigorously deposed Katt during the pretrial proceedings in this case, and there is no claim that her deposition testimony substantially differed (or differed at all) from her trial testimony (Tr. 863–64) Defendants do not argue, for example, that Katt remembered at her deposition the specific dates and times that she was harassed at the Seventh Precinct, but then forgot those particular dates and times when she testified at trial.[26] Thus, defendants cannot plausibly claim that they had no notice as of February 13, when the JPTO was submitted, or as of February 16, when the pretrial conference was held, that a statute of limitations defense might be applicable to their case, on the same theory advanced in support of that defense on February 26, in the middle of trial That fact alone forecloses their claim of manifest injustice. *See, e.g.,* 6A *Federal Practice and Procedure,* § 1527, at 287 (2d ed.1990) (no modification should be permitted where the "issue was within the knowledge of the party seeking modification at the time of the [pretrial] conference")

Moreover, even if defendants do have a colorable statute of limitations defense in this case, that defense is hardly conclusive. Even if the Court permitted the defendants to amend the JPTO in the middle of trial, it still would have been their burden to prove that no incidents of sexual harassment occurred during the limitations period. *See, e.g., Overall v. Estate of Klotz,* 52 F.3d 398, 403 (2d Cir.1995) ("Because the

---

25. What is said and discussed at a pretrial conference is hardly academic, as the parties were surely well aware "The pretrial conference should not be viewed merely as an informal meeting at which those involved can act without concern for future consequences. If the conference is to be a useful tool, all participants must be fully aware of the possible effects the pretrial hearing may have on the trial." Wright, Miller & Kane. 6A *Federal Practice and Procedure,* § 1527, at 262

26. If, on the other hand, plaintiff *did* testify at her deposition to a recollection of harassment occurring on particular dates within the limitations period, but failed, out of lost recollection or inadvertence, to mention those dates in her trial testimony, it is difficult to see how keeping defendants from profiting from that fact by putting the statute of limitations issue to the jury on a possibly incomplete or misleading record constitutes a manifest injustice

statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued"); *Global Entm't, Inc. v. New York Tel. Co.*, No. 00 Civ. 2959(SHS), 2000 WL 1672327, at *3 (S.D.N.Y. Nov. 6, 2000) ("Where the statute of limitations is an affirmative defense, the party asserting the defense must prove the elements of that defense") (internal quotation marks and citations omitted). But Katt testified that incidents of harassment at the Seventh Precinct were continuous—"very, very, regular"—and that they generally became "more vicious as time wore on" (Tr. 92–93, 96) It is thus highly unlikely that any jury that believed her story would nonetheless believe that such regular incidents of harassment abruptly stopped on July 28, 1992 Therefore, while this Court would have discretion to bar even an indisputable statute of limitations defense, the trial evidence belies the defendants' claim that precluding such a defense in this case would cause manifest injustice. At worst, the Court's ruling pursuant to Rule 16(e) deprived the defendants of a weak jury argument, not a favorable judgment.

### b. *Prejudice to the Plaintiff*

By contrast, there was a substantial risk that plaintiff would have been prejudiced had the Court permitted a mid-trial modification of the JPTO to include a statute of limitations defense *See, e.g., Bradford Trust Co.* 805 F.2d at 52 ("modifications should not be allowed that would seriously prejudice one of the parties"). Defendants do not argue that plaintiff should have known that a statute of limitations defense was potentially at issue when she presented her case. Therefore, her counsel had no reason to attempt to refresh the recollection of witnesses (including that of the plaintiff, whose testimony had concluded

days before defendants moved to modify the JPTO) as to the particular dates of alleged incidents of harassment, as they might have done had they known that defendants intended to argue a statute of limitations defense to the jury. This is exactly the type of prejudicial surprise that Rule 16(e) is intended to prevent. *See, e.g., Grossman v. Quentin Med. Lab., Inc.*, No 88 Cv. 3292(SJ), 1995 WL 728429, at *1 (E.D.N.Y. Nov. 21, 1995) ("The policies underlying Rule 16(e) include minimizing surprise and prejudice to a party at trial") (citing *Lamborn*, 873 F.2d at 527).

### 3 *Dismissed as a Matter of Law*

Finally, as is implicit in the above discussion, even if defendants had not waived their statute of limitations defense, the defendant still would not be entitled to the principal remedy they seek pursuant to Rule 50(b) As noted above, to be awarded judgment as a matter of law, defendants must establish that, viewing the evidence in the light most favorable to the plaintiff, no reasonable juror could have concluded that any incidents of sexual harassment occurred after July 28, 1992 But Katt not only testified to experiencing incessant harassment at the Seventh Precinct, the severity of which escalated over time, she also testified to a series of specific incidents which occurred during the summertime months—for example, the water pistol incident (Tr. 111), the car air conditioner incident (*id.* 111), and the comments on her bare shoulders (*id.* 87) Katt worked at the Seventh Precinct for less than two years—from January 1991 through December 1992 and a reasonable jury could well find that one or more of these summertime incidents (and others like them) occurred during the second summer of her employment there. Moreover, Katt's absentee records, which show escalating absences through the spring and summer of 1992, attributed by her to the effects of harassment, corroborate the

inference that some harassment must have occurred within the limitations window. (PX 2 & 82.) As Kleinman testified (Tr. 333, 334–35, 337–38), Katt's escalating absences were at least in part attributable to the escalating incidents of harassment she suffered at the Seventh Precinct.[27]

On this trial record, there certainly was not such a lack of evidence that defendants could be entitled to judgment as a matter of law on grounds of statute of limitations. The most defendants could be entitled to, even if they had raised the statute of limitations in the JPTO, would be an opportunity to put the issue to the jury. Consequently, even apart from the waiver of the issue pursuant to Rule 16(e), the defendants still would not be entitled to judgment as a matter of law—the chief remedy sought here (Defs.' Post–Trial Mot. at 6–7) and at trial (Tr. 699–701)—on the limitations defense.[28]

Accordingly, for all of the reasons discussed above, as well as those stated on the record at trial (*id.* 700–703, 858–65), defendants' motion as to statute of limitations is denied.

### C. *Causal Connection Between Sexual Harassment and Emotional Distress*

Finally, defendants move for judgment as a matter of law on grounds that plaintiff failed to demonstrate by a preponderance of the evidence that the alleged incidents of sexual harassment at the Seventh Precinct proximately caused her severe emotional distress. (Defs.' Post–Trial Mem. at 24–26) They argue that without such evidence of a causal nexus the plaintiff is not entitled to emotional distress damages.[29]

■ This claim lacks merit. The evidence established a sufficient basis from which a reasonable jury could find (and evidently did find) that the sexual harassment Katt experienced at the Seventh Precinct proximately caused her mental suffering. Katt testified that the sexual harassment caused, and continues to cause, severe emotional distress, which has manifested itself in various forms, including intestinal disorders and respiratory problems, vomiting, inability to hold down a job, and fear of intimate relationships with men. (Tr. 150–152.) Kleinman corroborated this testimony, and testified that in her professional opinion, Katt suffers from such symptoms as a *direct consequence* of the sexual harassment Katt experienced at the Seventh Precinct. (*Id.* 334–344) Kleinman based her opinion on over six hours of face-to-face interviews with Katt, a study of Katt's medical and life history, and a clinical test to determine

---

**27.** Though Katt's assault by her then-boyfriend eventually triggered an extended absence, this did no occur until the third week of August 1999. (Tr 153, 169.)

**28.** To the extent defendants renew their argument that the Court should have instructed the jury on statute of limitations (Defs. Post–Trial Mem at 7 n. 3), that argument is also waived under Rule 16(e), for substantially the reasons stated on the record (Tr 859–866)

**29.** This issue is appropriately raised in the instant motion. At the close of the plaintiff's case, defendants moved for judgment as a matter of law for plaintiff's failure to meet her burden on all claims (Tr. 699) While it is true that a motion pursuant to Rule 50(b) must first be made with some specificity at trial pursuant to Rule 50(a), *see, e.g., Piesco v. Koch*, 12 F.3d 332, 340 (2d Cir.1993), plaintiffs cannot seriously dispute that the defendants' trial motion for judgment as a matter of law fairly raised the issue of whether plaintiff had demonstrated a causal link between the allegations of sexual harassment and her purported disabilities. Therefore, though the Court rejects the defendants' motion on this ground, it find no merit to the plaintiff's claim (Pl's Post–Trial Mem at 8) that the issue is not properly raised in the defendants' Rule 50(b) motion

causality. (*Id.* 335–36.) According to Kleinman, the evidence demonstrated that though Katt suffered psychological symptoms prior to being sexually harassed at the Seventh Precinct, she had always recovered and been able to resume the normal activities of everyday life. (*Id* 339–40.) Only since her experiences at the Seventh Precinct has Katt become "barely" to "non-functioning" from a psychological standpoint. (*Id.* 362.)

The defendants presented their own expert witness to counter the testimony of Katt and Kleinman. This witness, Dr. Douglas Anderson, testified that based upon his own ninety-minute interview with Katt, it was his professional opinion that she suffered no psychological harm from sexual harassment, and that the various symptoms that he agreed Katt exhibited, were caused by other traumas in her life.[30] (*Id.* 758, 761.) Reasonable jurors might well have accepted Anderson's conclusion that other traumas in Katt's life, and in particular her brutal victimization by her then-boyfriend, were more serious than the workplace harassment she suffered, and more likely candidates for having caused long-term psychological damage. But reasonable jurors could also have accepted Kleinman's testimony that the particular symptoms exhibited by Katt, including nightmares about police officers (*id.* 336, 344–45), were more likely to be specifically associated with her experience of sexual harassment[31]

Whatever the competing views of the mental health practitioners, it is solely for the jury to weigh and assess the credibility of dueling experts. *See, e.g., Valdez v. Ward,* 219 F.3d 1222, 1238 (10th Cir.2000) (determination of whose expert's "testimony at trial was more credible was an issue solely within the province of the jury") (citing *United States v. Bohle,* 475 F.2d 872, 874 (2d Cir.1973)). *In re Joint E & S Dist. Asbestos Lit.,* 52 F.3d 1124, 1135 (2d Cir.1995) ("Trial courts should not abrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts") (internal quotation marks and alterations omitted); *Kreppel v. Guttman Breast Diag. Inst., Inc.,* No. 95 CIV. 10830(MHD), 2000 WL 369390, *3 (S.D.N.Y. April 11, 2000) (no grounds for a new trial where "jury's verdict indicates that the jurors assessed conflicting expert opinion and made a credibility determination that the analysis offered by [one expert] was more credible than that proffered by [another expert]") (citing *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992) (improper for district court to second-guess a jury's credibility determinations)). Katt's and Kleinman's testimony presented ample grounds for a reasonable jury which believed them (as this jury evidently did) to find that significant compensable mental and physical distress resulted from the harassment of which Katt complained Consequently, because there is no basis for the Court to second-guess the jury's determination

---

30. Significantly, Anderson did not suggest that Katt's disabilities were any less severe than Katt and Kleinman claimed. Defendants have never claimed that Katt is malingering or that her emotional distress and resultant physical symptoms are not real and serious. Their only claim is that these problems were not proved to have resulted from the acts of harassment that the jury found to have occurred

31. Perhaps the most reasonable jurors of all would have rejected both experts' either/or positions, and reached the sensible conclusion that Katt's humiliating treatment at her job was stressful and disturbing, and combined with pre-existing problems and subsequent tragedies to create a near-total breakdown

that plaintiff proved by a preponderance of the evidence that the Seventh Precinct's sexually hostile working environment proximately caused her severe emotional distress, defendants' motion for judgment as a matter of law on this ground is denied.

## II *Rule 59 Motion for a New Trial*

 Defendants next move for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure Rule 59 provides that "[a] new trial may be granted in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted." Fed R Civ P 59(a) A court may grant a new trial if, for example, "substantial errors were made in admitting evidence, or in charging the jury" *Sharkey v. Lasmo,* 55 F.Supp.2d 279, 289 (S.D.N.Y.1999). Under Rule 59, a court's decision whether to grant a new trial is "committed to the sound discretion of the trial judge." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992). Despite this discretion, a district court "should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lighting, Inc.,* 1998 WL 527307 (2d Cir.1998). *See also Piesco v. Koch,* 12 F.3d 332, 344 (2d Cir.1993) (reversal warranted only if "the verdict is a miscarriage of justice"). Defendants move for a new trial on three grounds, all of which, for the following reasons, lack merit.

### A. *Testimony of Dr. Leinen*

Defendants first argue that the Court erred by permitting Leinen to testify as an expert on the culture and practices of the NYPD by which officers and civilian employees might suffer recriminations for reporting official wrongdoing. Specifically, defendants contend (1) that Leinen should not have been qualified as an expert pursuant to Rule 702 of the Federal Rules of Civil Procedure, and (2) that even if properly admitted, the prejudicial impact of Leinen's testimony so substantially outweighed its probative value, that it should have been stricken from the record pursuant to Rule 403 of the Federal Rules of Civil Procedure (Defs. Post–Trial Mem. at 27–30.) Defendants argue that they should be granted a new trial on either ground.

### 1. *Applicable Standards*

### a. *Rule 702*

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed R. Civ P 702. The Rule makes clear that there are two prerequisites that must be met before the testimony of an expert witness can be admitted into evidence. First, the trial court must ensure that the witness is properly qualified as an expert to testify on matters that are scientific, technical or specialized in nature, *see, e.g., Jazmin Campbell v. Metro. Prop. & Cas. Ins Co.,* 239 F.3d 179, 183 (2d Cir.2001) ("preliminary assessment [is] whether the reasoning or methodology underlying the testimony is scientifically valid") (internal quotation marks omitted), and second, the trial court must determine that the expert's testimony " 'will assist the trier of fact to understand the evidence or determine a fact in issue.' " *Id.* (quoting Fed. R. Evid R 702) (citing *Daubert v. Merrell*

*Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

In *Daubert,* the Supreme Court recognized that Rule 702 intends to relax "the traditional barriers to 'opinion' testimony," thus "reinforc[ing] the idea that there should be a presumption of admissibility" of expert testimony *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995) (citing *Daubert,* 509 U.S. at 588, 113 S.Ct. 2786) *Daubert* set forth several factors to assist trial courts in assessing the reliability of expert testimony,[32] but made clear that these factors do not constitute a "definitive checklist or test" 509 U.S. at 593, 113 S.Ct. 2786 As the Supreme Court recently stated, "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *See also Johnson Elec. North Am., Inc. v. Mabuchi Motor Am. Corp.,* 103 F.Supp.2d 268, 282 (S.D.N.Y.2000) ("the four *Daubert* factors do not constitute a definitive checklist or test but must be tailored to the facts of the particular case") (internal quotation marks and citations omitted). In many cases, " 'the relevant reliability concerns may focus upon personal knowledge or experience.' " *Rivera v. Mill Hollow Corp.,* No. 96 Civ. 8150(TPG), 2000 WL 1175001 (S.D.N.Y. Aug. 18, 2000) (quoting *Kumho Tire Co.,* 526 U.S. at 150, 119 S.Ct. 1167).

"The decision to admit expert testimony under Rule 702 of the Federal Rules of Evidence is left to the broad discretion of the district court and will be sustained unless manifestly erroneous." *United States v. Tapia–Ortiz,* 23 F.3d 738, 740 (2d Cir.1994) (internal quotation marks and citations omitted). *See also United States v. Young,* 745 F.2d 733, 760 (1984) (" 'trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous' ") (internal citation omitted) (quoting 3 J. Weinstein & M Berger, *Weinstein's Federal Evidence* ¶ 702[02] (1981))

b. *Rule 403*

■ Even if expert testimony is deemed admissible, however, it is still subject to exclusion under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice to the moving party. *See United States v. Castillo,* 924 F.2d 1227, 1232 n. 9 (2d Cir.1991) (citing *United States v. Young,* 745 F.2d 733, 765 (2d Cir.1984) (Newman J., concurring)). *See also Karibian v. Columbia Univ,* 930 F.Supp. 134, 144 (S.D.N.Y.1996) ("*Daubert* makes it clear that the judge must be mindful of other applicable rules, including Rule 403") Rule 403 permits the trial judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. *See also Leopold v. Baccarat, Inc.,* 174 F.3d 261, 269 (2d Cir.1999) ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on

---

**32.** These include (1) whether a theory or technique can be or has been tested; (2) whether a theory has been subjected to peer review and publication, (3) whether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation, and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community *See Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786

something other than the established propositions in the case") (quoting 2 *Weinstein's Federal Evidence* § 403.04[1][b], at 403–36 (2d ed.1998) (construing Fed. R.Evid. 403)).

 As with Rule 702 determinations, matters of exclusion or inclusion of evidence pursuant to Rule 403 are left to the broad discretion of the district court. *See Costantino v. Herzog,* 203 F.3d 164, 173 (2d Cir.2000) ("Because the trial judge is in the best position to evaluate the evidence and its effect on the jury, his Rule 403 rulings are entitled to considerable deference and will not be overturned absent a clear abuse of discretion"). Accordingly, a new trial based upon such rulings will be granted only if it can be said that the ruling was "manifestly erroneous and an abuse of discretion." *Hathaway v. Coughlin,* 99 F.3d 550, 555 (2d Cir.1996). And as with all such evidentiary challenges, claims of error with regard to the admission or exclusion of evidence under Rules 403 and Rule 702 "are prime candidates for application of the harmless error rule." *LNC Invs. Inc. v. First Fid. Bank,* 126 F Supp 2d 778, 787 (quoting Wright, Miller & Kane, *Federal Practice and Procedure* § 2885 at 453–54). Therefore, even if the defendants can demonstrate trial error under Rule 702 or Rule 403, the proceeding "will not be disturbed, on posttrial motion in the district court or on appeal, unless any error of the court was truly harmful" *Id.*

## 2. *The Standards Applied*

Pursuant to discharging its obligations under Rule 59, the Court has re-read and carefully considered Leinen's trial testimony on direct and cross-examination, in itself and in light of all the evidence, as well as the Court's own recollections of how that evidence was presented at trial. Based upon that review, as well as a careful analysis of the Federal Rules of Evidence as interpreted by the cases cited herein, the Court, for the following reasons, finds that defendants demonstrate no manifest error or abuse of discretion relating to the admission of Leinen's expert testimony during the trial of this case.

### a. *Leinen's Qualifications*

 Leinen's credentials clearly qualify him as uniquely suited to testify as an expert in the culture of police departments in general, and the NYPD in particular, given his distinctive combination of "insider" experience and academic training. Leinen served as a decorated member of the NYPD for approximately twenty-three years, from 1966–1988, retiring with the rank of Lieutenant. (Leinen Expert Report 1/27/99 ("Expert Report") at 1–2, Tr. 886–87.) [33] During that period, he served in five different precincts, in capacities ranging from patrol officer, detective, lieutenant, and commanding officer (Expert Report 2, Tr. 886–87) His curriculum vitae also details an extensive academic background in the fields of sociology and criminal justice. He holds a B.A. and M.A. in Sociology from Queens College, and a Ph.D. in Sociology/Criminology from New York University. (Expert Report 2. Tr. 889.) He has published two books on police culture, both published by major peer-reviewed university presses. (Expert Report 2–3; Tr. 892.) [34] A third book, *Police*

---

**33.** The Court refers to Leinen's report in this discussion, since the original decision to admit his testimony was made *in limine,* on the basis of plaintiff's proffer which was based on that report (Tr. 3–4, 128–29.) As indicated by the parallel citations to the trial transcript, virtually all of this information was included in Leinen's trial testimony

**34.** His first book, *Black Police, White Society,* was published in 1984 by New York University Press, his second book, *Gay Cops,* was

*Lawlessness and the Blue Wall of Silence* is currently in development. (Expert Report 3, Tr. 893.)

Leinen is currently employed, full time, as an associate professor of sociology and criminal justice at Manhattan College in the Bronx, where he teaches courses in sociology, criminology, criminal investigation, police in society, minorities in policing, and issues in law enforcement. (Expert Report 3; Tr. 889–90.) He also serves as an advisor/mentor to police officers seeking college degrees at Empire State College, State University of New York. (Expert Report 3; Tr. 891–92.) In that capacity, he has interviewed hundreds of police officers concerning their experiences working in various paramilitary organizations, such as the NYPD. (*Id.*) He also has given a number of lectures to faculty and the general public on subjects ranging from police misconduct and the blue wall of silence, to problems facing minority and women employees of state and municipal police agencies (Expert Report 3; Tr. 890–91.) Leinen has previously been qualified to testify in the Eastern District of New York on the subject of "retaliation against police officers who bring discrimination complaints against their superiors or colleagues." *Valentin v. New York City*, 94 Civ 3911(CLP), slip op. at 44 (E.D.N.Y. Sept. 9, 1997).[35]

Leinen's extensive academic study and knowledge of, as well as personal experience with, the special pressures inherent in police work, and the fears of retaliation that might exist within police organizations, were sufficient to qualify him as an expert witness pursuant to Rule 702. *See, e.g., United States v. Salameh*, 152 F.3d 88, 129 (2d Cir.1998) ("expert testimony is proper under Rule 702 if it illuminates

matters 'not within the common knowledge of the average juror' ") (quoting *United States v. Duncan*, 42 F.3d 97, 102 n. 3 (2d Cir.1994)). *See also Deere v. Goodyear Tire & Rubber Co.*, 175 F.R.D. 157, 164 (N.D.N.Y.1997) (witness qualified as expert on account of "experience and training in the tire industry"); *Liriano v. Hobart Corp.*, 949 F.Supp. 171, 177 (S.D.N.Y. 1996) (witness qualified as expert on account of "personal experience in the field of safety engineering"). From his Expert Report, it was clear that Leinen had personally observed the institutional practices and culture throughout the NYPD, having served at every operational level of the department in several different NYPD precincts and specialized commands, over a twenty-three-year career. Further, his proposed testimony on the culture of retaliation within the NYPD was based not only upon such extensive personal experience and observation of the NYPD, but also upon considerable academic training and research. Similar expert testimony has been permitted in this and other courts. *See, e.g., Norris v. Waymire*, 114 F.3d 646, 652 (7th Cir.1997) (finding "affidavit of the plaintiff's expert, a professor of criminal justice ... admissible to show that the Town had been negligent in its supervision of [plaintiff]"); *Ariza v. City of New York*, 93 Civ 5287(CPS), 1996 WL 118535, at *5 (E.D.N.Y. March 7, 1996) (allowing the plaintiff to introduce testimony of experts and fellow police officers on the "code of silence that existed among police officers to prevent officers from breaking ranks"); *White–Ruiz v. City of New York*, No. 93 Civ 7233(DLC), 1996 WL 603983, at *8 (S.D.N.Y. Oct. 22, 1996) ("testimony of experts, fellow officers, and

---

published in 1993 by Rutgers University Press (*Id*)

**35.** The apparently unreported decision in *Valentin* is annexed to the Appendix of Plaintiff's Post–Trial Memorandum of Law as Exhibit A

[former police commissioner]" sufficient to allege "blue wall of silence" in civil rights case)

### b Validity of Methodology

*Daubert* requires more, however, than a sterling resume to permit opinion testimony by a professed expert The Supreme Court, manifestly concerned with the impact on jurors of "junk science" testimony, in which "experts" provide a basis for liability by offering unorthodox opinions outside the range of generally accepted scientific theory, rightly insisted that judges serve a "gatekeeping" function, *Daubert*, 509 U.S. at 589 n. 7 & 596, 113 S.Ct. 2786, to assess "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592, 113 S.Ct. 2786. *See also Advisory Committee Note to Rule 702* (2000 Amendment) ("The trial court's gatekeeping function requires more than simply taking the expert's word for it") (internal quotation marks omitted). Picking up on this conclusion, defendants argue that Leinen should not have been qualified

because his Expert Report demonstrated "no empirical studies" regarding the purported existence of a code of silence within the NYPD, and because his conclusions regarding police culture were based on a "flawed methodology" consisting largely of "anecdotal material" such as interviews and conversations with NYPD police officers. (Defs.' Notice of Motion Ex. B. 29–34.) [36]

▮▮▮ These challenges fail for two reasons. First, that an expert's opinion is not based on statistical studies does not render that opinion inadmissible, provided that the testimony will "assist the trier of fact to understand the evidence" concerning matters outside common experience, and the testimony is based on reasoning or methodology generally accepted within a particular profession or discipline. *See, e.g., Mabuchi Motor Am. Corp.*, 103 F.Supp.2d at 283 ("This Court's role is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor

---

**36.** There is no merit to defendants' objection that Leinen's testimony was based largely on hearsay Traditionally, experts have been permitted to rely upon hearsay evidence in forming their opinions, and may present such information to the jury to the extent necessary for the jury to understand the basis of their opinions

> Rule 703 permits experts to rely upon hearsay. The guarantee of trustworthiness [of the hearsay] is that it be the kind normally employed by experts in the field. The expert is assumed, if he meets the test of Rule 702, to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances.

*In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1223, 1243 (E.D.N.Y.), *aff'd* 818 F.2d 187 (2d Cir.1987) *See also United States v. Locascio*, 6 F.3d 924, 938 (2d Cir.1993) ("[E]xpert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions") (ci-

tations omitted) The 2000 Amendments to Rule 703 limit this long-standing rule, by allowing such reliance on hearsay only when "the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect" Rule 703 As more fully elaborated below, the Court in this case has no difficulty finding that extensive interviews with police officers conducted by a trained sociologist as part of a published research project and in connection with an accredited academic enterprise constitute a valuable and accepted basis for Leinen's conclusions, and that the admission of general testimony about the content of those interviews and a limited number of examples was necessary for the jury to understand the basis of his opinions. The need to present that basis substantially outweighed any prejudicial unreliability that may inhere in the hearsay, particularly given the expert's academic and investigative training in conducting interviews and evaluating their reliability

that characterizes the practice of an expert in the relevant field'") (quoting *Kumho Tire Co.*, 526 U.S. at 152, 119 S.Ct. 1167). The Expert Report in this case demonstrated that Leinen's testimony was to consist of opinions that were based not only on his own personal experiences at the NYPD, but also on his interviews with police officers, and the hundreds of commission reports, research articles, scholarly journals, books and newspaper reports that he had read in the course of over twenty years of academic research. (Expert Report at 4–7) Such data is of a type reasonably relied upon by experts in various disciplines of social science *See, e.g.,* Bernard Phillips, *Sociological Research Methods* 255 (1985) ("The data of historical research span a wide range of types and generally include almost all of the kinds of data that sociologists have used for their investigations.... They [include] newspaper reports and dispatches [and] questionnaire and interview schedules").

Moreover, the Court notes that Leinen was not only a veteran police officer, but also a trained sociologist with three academic degrees and a specialty observing police organizations, thereby possessing, in the Court's view, a basis from which to draw sound opinions or inferences from anecdotal or oral data. In this regard, the Court can draw on its own academic experience. As a professor of criminal law for over twenty years, having taught seminars in criminology and read hundreds of articles and books in the field, I have a personal familiarity with the standards and practices of academic criminology. A large and fully respectable branch of the field, including many works regarded as classics in the field, is based on "anecdotal" research of the sort relied upon by Leinen, incorporating interviews with police officers, criminals, and victims, in an effort to develop an understanding of actual practices in the real life of crime and law enforcement. Statistical methods are sometimes used to tabulate and analyze the results of interviews and survey data. But such techniques are not invariably used in such research. As Leinen himself pointed out, in one of his occasionally argumentative responses on cross-examination, it is difficult to see what sort of statistical study could be utilized to assess police culture with respect to reporting misconduct (Tr. 914), significantly, defendants suggest none.

Second, the defendants' challenges fail because they tend to impugn Leinen's skill and knowledge, thereby going to the weight and credibility, not the admissibility, of his testimony. *See, e.g., McCullock v. H B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995) ("[defendant's] quibble with [expert's] academic training and his other alleged shortcomings ... were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility") (internal citation omitted). Any shortcoming of his actual testimony in this vein was grist for cross-examination; not a ground for exclusion under Rule 702. *See, e.g., B.F. Goodrich v. Betkoski,* 99 F.3d 505, 525–26 (2d Cir. 1996) ("if the appellees honestly believe this scientific evidence is weak, they should cross-examine [the expert witness] vigorously at trial and present contrary evidence to refute his findings and conclusions"). Such cross-examination was had in this case. Defendants had the opportunity to, and did, bring out on cross-examination that Leinen's views were not based on statistical studies and relied heavily on hearsay information. (Tr. 912–15.) Therefore, the methodology underlying Leinen's conclusions and opinions was clearly laid out for the jury on both direct and cross-examination, enabling the jurors to decide what weight, if any, they deserved.

Accordingly, the Court adheres to its ruling at trial that Leinen was properly qualified to testify as an expert on the unique organizational culture and practices of the NYPD, and that the data and methodology underlying his testimony were academically sound and within the mainstream of criminological research

### c *Assisting the Trier of Fact: Relevance*

Leinen's expert testimony was also helpful to the jury in understanding the relevant evidence and determining a fact in issue Had the City prevailed on its *Burlington-Faragher* defense, plaintiff's cause of action against the City would have been defeated. To prove that defense, the City had to demonstrate by a preponderance of the evidence that, *inter alia*, the plaintiff unreasonably failed to use internal NYPD complaint procedures. Therefore, the reasonableness of Katt's decision to keep silent in the face of pervasive sexual harassment was a central issue in the case In deciding that issue, it was helpful and appropriate for the jury to have information from someone who had studied the special pressures inherent in police work and police organizations that might have made a fear of retaliation more realistic or reasonable in that context, as opposed to organizational contexts with which the jurors might otherwise have been familiar from their own personal knowledge and experiences. *See, e.g., Bunt v. Altec Indus., Inc.,* 962 F.Supp. 313, 318 (N.D.N.Y.1997) (expert testimony admissible where "it is manifest that an opinion ... on a central issue of the trial will assist the trier of fact in their understanding of the evidence and their determination of facts in issue") (citing *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786) ("consideration has been aptly described ... as one of fit" between the expert testimony and "a fact in issue") (internal quotation marks and citation omitted).

Defendants contend, however, that Leinen's testimony was not helpful, on the principal ground that "such a supposed code of silence can be readily understood and decided by the jury without any help from a so-called expert." (Defs.' Not. of Mot. Ex. E. at 28.) They argue that "given recent media coverage in high profile cases involving the NYPD, it cannot reasonably be said that citizens of New York City have no understanding or opinion concerning the existence and impact of the blue wall of silence" (*Id.*) But it is settled in this Circuit that expert testimony is helpful even where the jury might have general knowledge of the subject at issue, so long as such knowledge may be incomplete or inaccurate given the particular facts and circumstances relevant to the particular case for which expert testimony is offered *See, e.g., United States v. Amuso,* 21 F.3d 1251, 1264 (2d Cir.1994) ("Despite the prevalence of organized crime stories in the news and popular media, these topics [operational methods of organizational crime families] remain proper subjects for expert testimony"), *see also* Wright, Miller & Kane, *Federal Practice and Procedure* § 6264, at 213 ("expert testimony helps even where the jury has knowledge of the subject, but that knowledge may be incomplete or inaccurate") (citations omitted).

■ In this case, whatever preconceptions the jury may have had regarding incidents of police retaliation and cover-ups, jurors would be properly reluctant to assume that those preconceptions or impressions from the media accurately represented reality.[37] Plaintiff was entitled to

---

**37.** Indeed, it is somewhat strange for defendants to contend that expert testimony on this subject was prejudicial and potentially misleading, but that the jurors should safely have

offer evidence supporting her view of the actual conditions that exist in the NYPD, just as defendants would have been entitled, had they so chosen, to offer expert evidence rebutting it. The Court found both before and during trial, and continues to believe, that Leinen's testimony was helpful to assist the jury to understand why this particular plaintiff, a civilian police administrative aide with a sexual harassment claim, might reasonably have chosen not to take advantage of established departmental complaint procedures.[38] (Tr. 127–129, 917–18, 923.) Consequently, there is no basis for defendants' contention that the Court's admission of such testimony was manifest error, or that the Court in any way abused its Rule 702 "gatekeeping obligations." *Kumho Tire Co.*, 526 U.S. at 141, 119 S.Ct. 1167.

### d. *Prejudice Under Rule 403*

Defendants argue, however, that they were unfairly prejudiced by this testimony, to the extent that it potentially inflamed the jury against the NYPD by depicting the department as riddled with misconduct, retaliation and offensive behavior. (Defs.' Post–Trial Mot. at 27–28.) But this contention also must be rejected. The unfair prejudice claimed by defendants,

based on isolated snippets of testimony taken out of context, is greatly exaggerated; any prejudicial impact the testimony may have had resulting from the manner of Leinen's testimony was minimized by the Court's limitation of the testimony and emphatic limiting instruction; and the probative value of the testimony, as outlined above, far outweighed any minor prejudice that may nevertheless have occurred.

At the outset, it must be understood what sort of prejudice is at issue here. Undoubtedly, the core of Leinen's testimony—that there is a "code of silence" within the police department, defined as a "reluctance of members of the police department to come forward and testify or in any way inform against the misconduct of their fellow officers" (Tr. 894), and that this code is communicated in a variety of ways to officers and civilian employees (*id.* 898–900)—was damaging to defendants' case. That was, indeed, its purpose: plaintiff offered the testimony to refute defendants' affirmative defense by establishing that it was reasonable for Katt not to utilize the mechanisms of redress ostensibly offered by the department, since the "unspoken code" of the department discouraged, and indeed threatened retaliation for, the kind of com-

---

been allowed to rely on their own casual impressions of newspaper accounts and common gossip to arrive at conclusions

**38.** Leinen's Expert Report specifically stated that, on the basis of his experiences in the NYPD, and his academic study of police organization, he would testify that aggrieved civilian employees often experience the same retaliatory pressures as police officers:

[The] police Code of Silence, is an unwritten, often unspoken, rule that prohibits police officers *and civilian employees* of the department from reporting misconduct against another member of the department. [It] is a normal, inevitable feature of policing which has endured, over the years, changes in the racial and gender makeup of

the department. It permeates virtually every level of policing and begins in the Police Academy where recruits are taught that to inform on a fellow officer of the department is tantamount to political heresy *It protects both police officers and civilian employees* (Expert Report at 4) (emphasis added) While cross-examination suggested some limitations on Leinen's knowledge with respect to civilian employees (Tr. 913), his testimony on direct explained the basis for his conclusion that what he knew of police officers could be extended to civilian employees (*id.* 899–900, 907) Since that basis was entirely plausible, whether the limitations of his data undermined the credibility of his testimony was for the jury to decide

plaints invited by the official sexual harassment policy. Rule 403, however, does not disfavor this kind of "prejudice" to defendants' case. Rather, the rule speaks of *"unfair* prejudice ... or misleading the jury" Fed R. Civ. P. 403 (emphasis added). The Court must be careful to exclude evidence that *unfairly* prejudices the defense, by (for example) inflaming the jurors to hostility to the individual defendant or the NYPD generally, or by suggesting that the defendant is a bad person who has likely engaged in other forms of misconduct for which he should be punished, regardless of the merits of this case. It is such unfair prejudice that the Court has assessed, and found not to justify exclusion of the testimony

Defendants greatly exaggerate the extent of potential unfair prejudice occasioned by Leinen's testimony Contrary to their assertions, that testimony did not depict the NYPD as pervaded by gross misconduct Defendants' objections concentrate primarily on two aspects of his testimony First, Leinen did indeed testify that "misconduct" was common in the NYPD, and indeed that he himself had witnessed episodes of "police misconduct" "[t]oo many [times] to count" (Tr. 895.) But this testimony must be placed in its proper context. For one thing, Leinen made clear that his estimate was based on an extremely broad definition of "misconduct," going far beyond serious offenses such as brutality or corruption, to encompass as well "violation[s] of the rules and procedures of the police department." (*Id.* 895.) Leinen made clear that such rules and

procedures are so pervasive that "it's virtually impossible for an officer to get through a day without violating one of the rules in the patrol guide." (*Id.* 896.) In context, moreover, Leinen's description of widespread misconduct was obviously not intended, nor would a reasonable juror have taken it, as an effort to depict the average police officer as lawless. To the contrary, this testimony was part of Leinen's effort to explain the origins of the "code of silence" he contended existed in the Department, as deriving in part from the fact that officers' jobs are difficult and hedged about with sometimes arbitrary rules, leading officers to develop a habit of covering up or declining to report "misconduct" that officers come to feel is intrinsic to the work of even good cops: since "[y]ou can't get through a day in the police department without violating some rule in the patrol guide" (*id.* 896), it is understandable that officers come to have a protective view with respect to reporting each other's "misconduct." Taken in context, Leinen's testimony about the extent of "misconduct" in the NYPD was hardly inflammatory at all.[39]

Second, Leinen described examples, known to him from his research, of retaliation of varying severity meted out to violators of the "code of silence." (*Id.* 900–904.) Defendants contend that this testimony, which included accounts of gross and even criminal conduct, was unduly inflammatory. The Court disagrees. It was central to the probative value of the testimony that the unspoken "code of silence"

---

**39.** While Leinen testified in general that police "misconduct" covered by the code of silence could include a variety of matters, including brutality, corruption, and various forms of discrimination as well as violations of the patrol guide (Tr. 895), the only misconduct besides minor violations of the patrol guide that he testified to having personally observed in his 23 years on the force were

instances of brutality. (*Id.* 897.) The reference was brief and passing, without any details as to the extent, frequency or severity of the conduct In the wake of such recent highly-publicized cases as the Abner Louima affair, of which any sentient juror was surely aware, this minimal reference to police brutality can hardly have inflamed the jurors or told them anything they did not already know

is regularly enforced by retaliation against "rats" who inform on officers, and that instances of such retaliation are widely known within the department. But if such testimony is to be given, it is essential, in fairness to both sides, to permit some explanation of what the witness means by "retaliation." The question before the jury was whether it was reasonable for Katt to fail to take advantage of the department's sexual harassment complaint procedures, and the reasonableness of her behavior turns in part on what she might reasonably fear Accordingly, the Court permitted limited testimony describing the range of retaliatory behaviors that exist within the department. While some of the testimony was perhaps unnecessarily graphic (*see, e.g., id.* 904) (references to used condoms or sanitary napkins), the core of the testimony was relevant, and the unfair prejudice limited.[40]

Any potential for prejudice from the challenged testimony, in short, stems from its tendency to demonstrate that there are bad cops, and that bad cops sometimes do very bad things to fellow officers who report their misconduct. But this should be no surprise to reasonable jurors residing in this district. The same periodic official investigations of police misconduct and cover-ups on which Leinen in part relied in forming his conclusions (*id.* 894) are well known to residents of the New York metropolitan area, who accordingly would be neither surprised nor inflamed by those conclusions. Nor should reasonable jurors, particularly when specifically in-

structed on the subject (*see infra* pp. 81–82), have had any difficulty separating the existence of such misbehavior from an assessment of whether the evidence shows that the particular officer whose conduct they were to assess in this case engaged in the sexual harassment that plaintiff claimed she suffered. The evidence in question was clearly presented to the jury as relevant only to the reasonableness of her fear that she would suffer recriminations for reporting any harassment that might have occurred. Thus, it is unlikely that Leinen's testimony, even taken in its most prejudicial light, could have caused the jury "to base its decision on something other than the established propositions in the case." *Leopold,* 174 F.3d at 269 (internal quotation marks omitted).

This is not to say, however, that Leinen's testimony in all respects lived up to the Court's expectations derived from his credentials and from plaintiff's pre-trial offer of proof. Leinen gave a number of nonresponsive and rambling answers, both on direct and cross-examination. He argued with counsel (*id.* 910, 915), and in several cases appeared to retail anecdotes (*id.* 902–903, 904, 905) rather than present detached conclusions filtered through an objective analysis, as the Court had expected he would. As noted above, some of these examples included unnecessarily vulgar details of retaliation against police officers who broke the purported code of silence, such as used condoms being thrown in lockers, and sexual paraphernalia sent

---

**40.** Among other steps to limit prejudice, the Court sustained an objection to a question asking the witness to describe particular instances of retaliation he personally observed (Tr. 902), and cut off the witness when he began to give anecdotal examples he had heard about (*id.* 903) Instead, the Court permitted limited questioning about the *range* of retaliatory behavior, ranging from the "cold shoulder" or "silent treatment" (*id.* 903) to

framing officers on criminal charges (*id.* 905) The Court twice intervened to limit questions or answers (*id.* 904, 905), the testimony was clear that this range of retaliatory behavior covered all sorts of diverse situations, and even on direct examination (later amplified on cross), it was made clear that Leinen was not personally aware of any episodes of retaliation for sexual harassment complaints (*id.* 906) *Cf.* Tr. 908–909, 912 (cross-examination)

to the spouse and children of an accused snitch. (*Id.* 902–903, 904) Moreover, questions by the Court on direct (*id* 899–900, 906, 912, 914) and by defense counsel on cross-examination (*id.* 908–17), established that Leinen had little direct experience with civilian employees. But these arguable shortfalls in Leinen's testimony were not so extensive as to require that his testimony be stricken from the record, let alone that the testimony was so prejudicial as to warrant a new trial. *See, e.g., Hathaway,* 99 F.3d at 555 (reversal warranted only upon a showing that evidentiary admission was "manifestly erroneous and an abuse of discretion"). *Fiacco v. City of Rensselaer,* 783 F.2d 319, 327 (2d Cir.1986) ("[Rule 403] grants to the trial judge broad discretion to determine whether to allow the introduction of relevant, but prejudicial, matters into evidence").

The Court made full use of the tools available to it to restrain and limit these defects in the testimony. The Court sustained objections to questions that it believed sought to elicit irrelevant, excessive or inflammatory detail (Tr. 895, 896, 900, 902, 904, 905, 906), struck a remark about what "every cop" knows (*id.* 897), reformulated questions and answers to limit the prejudicial impact of testimony (*id.* 900, 902), and cautioned both counsel and the witness when topics had been exhausted or the witness went beyond the question asked (*id.* 903, 904, 906, 907). *See also supra* n. 40 (steps taken to limit prejudice). Moreover, on the morning immediately following Leinen's testimony, the Court gave an extensive curative instruction (*id.* 938–41), explaining the narrow basis for which his testimony was to be used, if the jury chose to use it at all. *See, e.g., Agron v. Trustees of Columbia Univ.,* 176 F.R.D. 445, 451 (S.D.N.Y.1997) (" '[i]n reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction' ") (quoting *Advisory Committee Note to Rule 403* ) (alteration in original) Over the plaintiff's objections, this instruction was given before summations, to emphasize its direct relevance to Leinen's testimony and to distinguish it from the Court's general instructions on the credibility of witnesses and the role of experts, which of course also emphasized the jury's responsibility to evaluate witness testimony with great care. (*Id.* 19–20, 528–30, 997–1001.)

The instruction noted that Leinen's testimony was admitted solely for whatever light it cast on whether it was reasonable for plaintiff not to take advantage of the NYPD's sexual harassment policy (*Id.* 939–40) In addition, the jury was specifically instructed not to be distracted by any testimony about alleged misbehavior by police officers not at issue in the case:

There is one specific caution that I'm going to emphasize, even though I know that your common sense will tell you the exact same thing without my even saying so. This case is about what happened at the 7th Precinct in 1991 and 1992 involving Ms. Katt and Mr. DiPalma. You've heard testimony from various people that bears on those events. This case is not about what other police officers at other times or places may or may not have done to other people. We all know, without Dr. Leinen to tell us, that some police officers have done some bad things, just as many people who are not police officers have done some bad things, but those things have nothing to do with this case.

This isn't a case about police brutality or theft or planting drugs on people, neither is it a case about violating technicalities in the patrol guide. No one has accused Mr. DiPalma of anything like that. And even if they did, it wouldn't

have anything to do with this case. It would be just as unfair to hold against Mr. DiPalma things that other officers did in other situations that have nothing to do with this as it would be to hold against him what other people of his race or sex did. I'm confident that you would never do that and that you don't really need to be told it, but I think it is appropriate to put it on the record so there is no mistake about it, that other types of alleged misconduct by other police officers not involved in the 7th Precinct and not known to Ms. Katt are not really the issues here.

(*Id* 940–41).

It is presumed that juries follow strong cautionary instructions like this one. *See, e.g., Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it"); *United States v. Colombo,* 909 F.2d 711, 715 (2d Cir.1990) ("we presume that a jury adheres to the curative instructions of the trial court"), *United States v. Pforzheimer,* 826 F.2d 200, 205 (2d Cir.1987) ("[it is] a fundamental proposition that a jury is presumed to follow the instructions of the trial judge") The jurors in the instant case struck the Court as a particularly skeptical, self-reliant, and conscientious group, unlikely to be swayed by any irrelevant implications of Leinen's testimony, and fully able to follow the Court's instructions. Such observations of the jury's reactions and demeanor were pertinent to the Court's decision not to strike the challenged testimony from the record. *See, e.g., United States v. Payton,* 159 F.3d 49, 59 (2d Cir.1998) (under Rule 403 "the trial

judge is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendants, jurors, and counsel, and their mannerisms and reactions") (internal quotation marks and citations omitted).

To the extent that Leinen's testimony appeared unduly partisan in any respect, such an appearance went not to the admissibility of his testimony, but to the determination of its ultimate weight and credibility—a subject that falls squarely within the jury's prerogative. *See, e.g., McCullock,* 61 F.3d at 1043–44 ("quibble" with expert witness's background or bases for opinion go to "weight and credibility" of testimony "not its admissibility"). To the extent that the Court found the testimony in certain respects weak or unpersuasive, that does not give the Court grounds to strike it pursuant to Rule 403 *See, e.g., Jazmin Campbell,* 239 F.3d at 183 ("to the extent that [defendant] asserts that there were gaps or inconsistencies in the reasoning leading to [expert witness's] opinion such arguments go to the weight of the evidence, not its admissibility") Indeed, such observations were surely available to the jury, and Leinen's occasionally argumentative demeanor no doubt counted against his credibility with the jury So long as Leinen provided the jury with useful information about the organizational culture of the NYPD (which he did), and was available for vigorous cross-examination to defeat the instant concerns of prejudice from isolated anecdotal evidence (which he was), the probative value of his testimony well outweighed any prejudicial effect, and it was for the jury to decide what if any weight to give to his opinions.[41]

41. In a footnote to their reply brief, defendants cite transcript excerpts from two unreported cases (Defs.' Post–Trial Rep. Mem. at 10 n. 3) (Smith Aff. Exs. A & B) (attaching

transcript excerpts from *Patrolmen's Benevolent Assoc., Inc. v. New York City,* 97 Civ. 7895 (S.D.N.Y.1997) *and Lederman v. Adams,* 96 Civ. 4569 (S.D.N.Y.1996)), in which trial

### e. *Harmless Error*

 Finally, even if the Court erred in its decision to admit Leinen's testimony, or if its efforts to limit any unfair prejudice from his testimony fell short of the ideal, it is inconceivable to the Court, having sat through the trial and observed the totality of the evidence, as well as the demeanor of the witnesses and the jurors, that any error was so prejudicial to the result in the case as to require the grant of a mistrial at the time, or a new trial at this juncture. In light of the totality of the evidence, any error was surely harmless.

First, Leinen's direct testimony occupied only 20 pages out of a trial transcript of over 1000 pages. Eight of those pages were consumed by the recitation of the witness's credentials, and the length of his substantive testimony is considerably inflated by the various objections and interventions by the Court described above. While even brief testimony of a highly inflammatory nature could have a significant potential for prejudice, the idea that such limited testimony distracted or prejudiced the jury from its essential task is difficult to accept. Moreover, given the extent of the Court's interventions and the lengthy limiting instruction, the jury could not have been left in any doubt about the legitimate purpose of the testimony and its obligation to disregard any other impact it might have.

Second, defendants had ample opportunity to cross-examine Leinen, or to offer any expert testimony of its own. Such cross-examination as was conducted effectively highlighted certain contradictions in Leinen's testimony at deposition and at trial (Tr. 908); brought out at best equivocal testimony as to whether Leinen had ever personally witnessed retaliatory behavior or knew people who had (*id.* 909–10), and established that his research had not included interviews with civilian police employees (*id.* 913), that he had not utilized any statistical information in forming his conclusions (*id.* 913–14), and that he

judges struck expert testimony offered by Leinen on different subjects. Neither of these cases were ever brought to the Court's attention during trial, or at any pretrial proceeding in this case. Though defendants cite these cases in support of their Rule 59 motion for a new trial, they certainly have no bearing on this Court's initial decision to admit Leinen's testimony, since the Court had no way of knowing of them until now. Nor do they bear on the Court's decision at trial not to strike Leinen's testimony. First, as to Leinen's qualifications, the difficulty in those cases was that the judges involved found Leinen unqualified to testify about the issues relevant in those cases, which were quite different than the issues here. Leinen testified in this case concerning on the culture and practices of police organizations by which officers and civilian employees might fear recriminations for reporting official wrongdoing. As explained above, and by Judge Pollak of the Eastern District in *Valentin*, 94 Civ 3911(CLP), slip op. at 43–49, such issues are Leinen's academic specialty. By contrast, in *Patrolmen's Benevolent Assoc*, Judge Scheind-lin precluded Leinen from testifying as to how the NYPD assigns newly commissioned police officers to their first departmental precinct (Smith Aff Ex A at 2018–19), because his trial testimony revealed that his knowledge of NYPD transfer procedures was limited to the procedures for seasoned officers, and did not extend to the initial assignment procedures at issue in that case. (*Id.*) Similarly, in *Lederman*, Judge Chin struck Leinen's testimony on how the NYPD trained officers to handle crime scene witnesses (*id.* Ex B at 594–95), because Leinen admitted that he had no basis for knowing what those procedures were during the period (1995–96) relevant to that case. (*Id.*) Leinen's lack of expertise in those specific areas of police practice, has no bearing on his experience and knowledge of general police culture and practices by which police employees might fear retaliation for reporting official wrongdoing. Second, as to the probative/prejudicial balance with respect to Leinen's actual testimony, the testimony given in this case stands or falls on its own merits; the value of his testimony or lack of it in other cases is not relevant to this inquiry

had conducted no specific research with respect to retaliation for the filing of equal opportunity complaints (*id.* 916). Defendants' tactical choices to limit their cross-examination of Leinen, and not to call any witnesses of their own to refute his testimony, speak volumes both about the essential accuracy of the core of his testimony, and about the unlikelihood of any genuine prejudice from his occasional excesses of enthusiasm. Defendants evidently concluded that they could leave his testimony, for the most part, well enough alone.

Third, other evidence in the case left the jury with far more effective evidence of the "code of silence" than Leinen's testimony. *See, e.g.,* Wright, Miller & Kane, *Federal Practice and Procedure* § 5215, at 280 ("In assessing prejudice [under Rule 403], *the court must look at other evidence in the case as well as the proffered testimony*") (emphasis added). For example, Katt herself testified to particular details—threats from DiPalma and others, and inferences from Police Academy instructors—regarding the likelihood of retaliation against NYPD employees who file formal complaints against police officers. (Tr. 61, 75, 99–102, 124–25, 139–43.)

The jury also had available the testimony of some of Katt's co-workers. Katt testified that she complained of DiPalma's alleged harassment to Stella Morales Castillo, her best friend at the Seventh Precinct. (*Id.* 122.) Castillo was a fellow PAA who worked with Katt at the Seventh Precinct for two years. She is still employed there to this day, and is married to a New York City police officer. Castillo—in the face of documentary evidence casting doubt on her testimony—denied that she was ever Katt's friend. (*Id* 732–33. PX 167.) Her demeanor, moreover, gave the clear impression to anyone in the courtroom that she did not want to be

there. While it was entirely up to the jury to assess Castillo's demeanor and determine her veracity, from the Court's own observations, Castillo's testimony could well have had far more impact on a jury considering whether Katt's testimony was believable, and whether her fear of retaliation was reasonable, than any expert testimony. Raymond Perez, the civilian police employee who corroborated Katt's account of the water-pistol incident, was a similarly reluctant witness for plaintiff, requiring frequent refreshment of recollection from his deposition transcript and appearing to admit only such details as he had already provided under oath. (*Id.* 300–301, 303–304, 305, 308–310.) Lula Williams, another PAA who worked with Katt, specifically testified that she would have feared command discipline for reporting wrongdoing at the Seventh Precinct. (*Id.* 696.) Reasonable jurors thus had ample basis beyond Leinen's testimony for concluding that Katt reasonably and in good faith feared retaliation had she utilized the NYPD's procedures for complaining of sexual harassment. *See, e.g.,* Wright, Miller & Kane, *Federal Practice and Procedure* § 5215, at 280 ("Where the prejudicial fact has already come before the jury through other proof, that cumulative impact of the proffered testimony maybe so slight as not to warrant exclusion") (citations omitted).

Finally, the Court must note that the essence of the case involved determining the respective credibility of plaintiff Katt and defendant DiPalma. This is quintessentially the province of the jury, and the jury here had ample basis to make its determination. The weaknesses of Katt's testimony were amply explored on cross-examination and via the testimony of the psychiatric experts. Similarly, DiPalma's testimony was before the jury and fully available for assessment of his credibility. The notion that the jury was inflamed to

disbelieve his testimony and accept Katt's by tales of police misconduct in other situations, rather than by their assessments of the parties themselves and of the independent evidence corroborating Katt's narrative—such as the "976–Line" photograph (PX 32), the testimony of handwriting expert Palladino (*id.* 467–83), and Perez's testimony corroborating the water-pistol incident (*id.* 313–14, 316)—is entirely incredible to at least this observer of the trial

For all of the above reasons, nothing about Leinen's testimony affords grounds for a new trial pursuant to Rule 59

### B. *DiPalma's Cross–Examination*

There is no merit to the defendants' next claim (made without supporting authority) that "the Court should not have permitted hypothetical questions to be posed to and answered by Lt. DiPalma." (Defs.' Post–Trial Mem. at 32–33.) Pursuant to Rule 611(b) of the Federal Rules of Evidence, district courts have broad discretion regarding the scope and extent of cross-examination. *See, e.g., United States v. Koskerides,* 877 F.2d 1129, 1136 (2d Cir.1989) ("The district court has broad discretion to determine the scope of cross-examination. . . . We will not overturn an exercise of the district court's discretion absent a clear showing of abuse") (internal citations omitted) (construing Fed.R.Evid. 611(b)).[42] Defendants fall well short of demonstrating any abuse of discretion relating to the Court's evidentiary rulings during DiPalma's cross-examination.

■ Defendants challenge a series of questions relating to DiPalma's understanding of the NYPD's sexual harassment policies (Tr 614–22.) DiPalma was asked, for example, whether there would be circumstances under which it would be appropriate to ask a female civilian employee about the type of underwear she wears (*id.* 617), or whether the employee engages in toe sex (*id.* 620), or whether he could put his "throbbing manroot into her wet recesses" (*id.* 617). DiPalma answered that such questions could be appropriate, depending on the circumstances. But no matter how damaging DiPalma's answers may have been, the challenged questions themselves were directly relevant to the City's *Burlington–Faragher* defense, by which the City had to demonstrate, *inter alia,* that the NYPD exercised reasonable care in preventing its employees from committing acts of sexual harassment. That topic—the extent and reasonableness of the NYPD's sexual harassment training program—was covered in some detail during DiPalma's direct examination. (*Id.* 567, 591–92.) DiPalma further testified on direct that his interactions with civilian employees of the Seventh Precinct, including his interactions with the plaintiff, were always "business like and cordial." (*Id.* 576.) Based on such direct testimony, plaintiff counsel's questioning into DiPalma's personal understanding of the NYPD's sexual harassment policy, as well as his personal understanding as to the appropriate treatment of female civilian employees, fell well within the permissible limits for cross-examination under Rule 611(b). *See, e.g.,* 4J McLaughlin, *Weinstein's Federal Evidence* § 611.03[2], at 611–28 (2d ed. 2000) ("Typically, cross-examination is permitted when 'reasonably related' to the defendant's direct testimony") (citations omitted).

---

**42.** Fed.R.Evid. 611(b) provides
*Scope of Cross–Examination*—Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness The court may, in the exercise of its discretion, permit inquiry into additional matters as if on direct examination

Equally without merit is defendants' suggestion that the Court erroneously permitted plaintiff's counsel to delve into wide-ranging and irrelevant matters when cross-examining DiPalma The Court did nothing of the sort As the transcript demonstrates, the Court sustained most of the defendant's objections (*id.* 614, 619–21), admonished plaintiff's counsel to be "very precise" and "careful" with his questioning (*id.* 619), and instructed the jury that it was to consider the isolated testimony now challenged "only" to the extent relevant to "DiPalma's understanding of the [NYPD's] sexual harassment policies" (*id.* 621).

Accordingly, nothing about the scope or mode of DiPalma's cross-examination affords grounds for a new trial

### C. *Jury Instruction*

Defendants next claim that the Court erred by failing to instruct the jury that plaintiff withdrew her § 1983 claim against the City. (Defs.' Post–Trial Mem. at 30–32, 33.) It argues that without an instruction that plaintiff had withdrawn the federal claim, the jury was misled as to the correct legal standard to apply in this case. (*Id.* at 30.) The Court rejected this claim at trial (Tr. 938) and continues to conclude that its refusal to instruct the jury on plaintiff's withdrawn § 1983 claim was not error, let alone one that might justify setting aside the verdict.

"[A] jury instruction will be deemed adequate, so long as the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Care*

*Travel Co. v. Pan Am. World Airways, Inc.,* 944 F.2d 983, 996 (2d Cir.1991). *See also Hester v. BIC Corp.,* 225 F.3d 178, 186 (2d Cir.2000) ("A jury charge is erroneous if the instruction misled the jury as to the proper legal standard or did not adequately inform the jury of the law") The Court's jury instruction in this case covered the essential issues for a sexually hostile work environment claim, as set forth by leading commentators and authorities. (Tr. 990–1028) Indeed, the defendants raise no challenge now, as they raised none at trial, to the substantive accuracy of the Court's instruction regarding what the plaintiff needed to prove to establish liability or damages

▆▆▆ The instruction requested by the City would have served no purpose but to have wrapped this otherwise sound charge in confusing and irrelevant cotton. As the Court stated on the record, lay jurors have no particular interest as to whether the statutory source of a municipal defendant's liability is state anti-discrimination law or § 1983 (*id.* 938), and nothing about their function requires them to know—especially where (as here) all parties agreed that the standards for substantive liability under each statute was the same (*id.* 824, 829–30; Tr. of 2/16/2001 at 5–6, 10) *See also Wise v. New York City Police Dep't,* 928 F.Supp. 355, 364, 373 (S.D.N.Y.1996) (denying motion for summary judgment on sexual harassment claim brought under both § 1983 and the New York State Human Rights Law pursuant to identical liability standards).[43] Defendants do not,

---

**43.** Nor did the presence or absence of a claim under § 1983 affect the scope of the evidence admissible at trial. It was agreed during the final pretrial conference in this case, that evidence regarding the NYPD's "failure to train" its employees on matters of sexual harassment would be relevant at trial, not only for the plaintiff to prove her § 1983

claim against the City, but also for the City to prove its affirmative *Burlington-Faragher* defense against the plaintiff. (Tr. of 2/16/01 at 27–31) Therefore, the evidence at trial concerning the effectiveness of the NYPD's policies, and the reasonableness of its complaint mechanisms, remained central to this case

and cannot, complain that the jury was not accurately instructed about the elements of liability on the part of DiPalma under § 1983 and the State and City statutes, or of the City under the State and City Human Rights Laws, which were the only claims that were left for submission to the jury.

Nor do defendants point to any way in which any reference to § 1983 in the earlier part of the trial could possibly have confused the jury, or required a later curative instruction. Since all of the evidence offered at trial was relevant to the causes of action submitted to the jury, and the jury's instructions accurately described what the jury needed to find to return a verdict for the plaintiff, it is entirely unclear what purpose the City claims would have been served by instructing the jury that the plaintiff's § 1983 claim against the City (which would have required an instruction about municipal liability under *Monell* ) was no longer in play.

Also unavailing is defendant's contention (made in two sentences and without supporting authority) that the Court should have instructed the jury that plaintiff was not seeking economic damages such as back pay. (Defs.' Post–Trial Mem. at 33.) Defendants cite no portion of the charge

that erroneously implied to the jury that the plaintiff *was* seeking back pay, for there were no such misleading instructions. The Court gave the standard instruction on damages in this case (Tr. 1014),[44] and finds no basis for defendants' objection.

Accordingly, the charge in this case having been legally correct and sufficient in all respects to allow the jury to intelligently determine the questions presented to it, the defendants' challenge to the charge, like the other issues raised in their Rule 59 motion, is without merit.

III. *Remittitur of the Jury's $400,000 Compensatory Damage Award*

In the alternative to defendants' Rule 50(b) and Rule 59 motions, they request that the Court enter a remittitur of the jury's compensatory damage award. They contend that the weight of the evidence does not support a verdict in the sum of $400,000, and that the award should be remitted "by $365,000, to $35,000 or less." (Defs.' Post–Trial Mem at 35–39.) Because the Court finds the jury's verdict to fall within the range of reasonable awards in light of comparable claims, the defendants' motion for remittitur is denied

---

both before and after plaintiff withdrew her § 1983 against the City

**44.** The Court's instruction was as follows. "Compensatory damages are not limited to any expense the plaintiff may have borne A prevailing plaintiff is entitled to damages also for the emotional pain and suffering, mental anguish, humiliation or discomfort that she suffered because of a defendant's wrongful conduct." (Tr 1014) That was the appropriate charge in this case. *See, e.g., Walia v. Vivek Purmasir & Assocs, Inc.,* 99 Civ. 2428(RJD), 2000 WL 1523286, at *7 (E.D.N.Y. Feb. 8, 2000) ("Under the NYHRL, plaintiff is entitled to seek compensatory damages, including damages for mental anguish and humiliation") Though the plaintiff re-

quested a specific instruction that the plaintiff was not seeking back pay, it failed to provide the Court with particular language, or a particular suggestion as to where such an instruction should have been inserted into this charge. (Tr 846–47.) As the Court stated at the charging conference, "I was paying attention to this issue, and I don't think I put anything that specifically suggests anything like that, that is, that the plaintiff would be entitled to back pay. I talk about expenses that she may have borne, emotional pain and suffering, mental anguish, humiliation and discomfort." (*Id.* 846) Upon reviewing the transcript and charge in light of the defendants' post-trial motion, the Court finds no basis for a different conclusion here

369

## A. Legal Standards for Remittitur

 "[C]alculation of damages is the province of the jury," *Ismail v. Cohen*, 899 F.2d 183, 188 (2d Cir.1996) (citations omitted), and a compensatory damage award will not be set aside unless "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.1998). To determine whether a jury award shocks the judicial conscience, "a court's obligation is to examine [awards for] comparable injuries." *Consorti v. Armstrong World Indus., Inc.*, 9 F.Supp.2d 307, 311 (S.D.N.Y.1998), *vacated on other grounds*, 518 U.S. 1031, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996) (citation omitted). The court's task, however, "is not to balance the number of high and low awards and reject the verdict in the instant case if the number of the lower awards is greater. Rather, [the court must] inquire whether the [jury's] verdict is *within a reasonable range.*" *Ismail*, 899 F.2d at 187 (emphasis added). *See also Morales v. City of New York*, No. 99 Civ 10004(DLC), 2001 WL 8594, at *3 (S.D.N.Y. Jan. 2, 2001) ("court should determine whether the award is 'within reasonable range'") (quoting *Ismail*)[45] Where a verdict is one for emotional distress, the Second Circuit is "willing to uphold substantial awards where warranted." *Ismail*, 899 F.2d at 186 (citations omitted).

## B. Standards Applied

 Having reviewed compensatory damage awards in similar cases, the Court concludes that the jury's award in this case is within a "reasonable range" and does not shock the conscience of the Court. *See, e.g., Hughes v. Patrolmen's Benevolent Ass'n*, 850 F.2d 876, 883 (2d Cir.1988) ($225,000 in emotional distress damages in light of concerted harassment was not excessive even though no permanent harm resulted); *Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 362 (E.D.N.Y.1999) ($250,000 in compensatory damages for emotional distress from sexual orientation discrimination); *Ramirez v. New York City Off-Track Betting Corp.*, No. 93 Civ. 0682(LAP), 1996 WL

---

**45.** New York law applies a stricter standard than the "reasonable range" test, instructing reviewing courts to determine whether the challenged award "materially deviates from what would be reasonable compensation." N.Y. Civ. Prac. Law & Rules § 5501(c). *See also Armstrong World Indus.* 72 F.3d at 1011 (New York standard is "less deferential to the jury's verdict than the federal standard") While a court should apply federal law in determining the excessiveness of a damages award on a federal cause of action, it should apply New York law to test damages awards on claims governed by New York law. *See, e.g., Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 430–31, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Here, where the plaintiff may be compensated for emotional distress damages under both federal and state causes of action, the Court will apply the more deferential federal standard in evaluating the jury's award. *See, e.g.,Kim v. Dial Svc. Int'l, Inc.*, No 96 CIV 3327(DLC), 1997 WL 458783, at *5 n. 2 (S.D.N.Y. Aug. 11, 1997) (using federal standards where not compelled to apply pendent state law). Strictly speaking, perhaps the Court should evaluate the federal remittitur standards of the damage award against DiPalma, against whom liability was found under federal law, and the state standards to the award against the City, against whom the federal claim was withdrawn However, the closeness of the two standards, and the practical certainty that the City will indemnify DiPalma and thus bear the cost of the award in any event, would reduce the effort to academic punctilio. The Court further notes that the Supreme Court's recent decision in *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, —— U.S. ——, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), requiring *de novo* appellate review of punitive damages claimed to violate due process, is not applicable to this case, in which no constitutional issue is raised, and the defendants' objection is to compensatory, not punitive, damages

210001, at *6 (S.D.N.Y. April 30, 1996) ($500,000 award does not shock the conscience in employment discrimination case where "[d]ramatic evidence was admitted at trial demonstrating that [defendant's actions] aggravated plaintiff's psychological problems to such an extreme that he ceased to be able to function in society"), *aff'd in relevant part, rev'd in part,* 112 F.3d 38 (2d Cir.1997); *Tiffany & Co. v. Smith,* 224 A.D.2d 332, 638 N.Y.S.2d 454, 454 (1st Dep't 1996) ($300,000 in compensatory damages under State Human Rights Law for emotional distress caused by "constant, egregious, and blatant" discriminatory conduct). *Town of Hempstead v. State Div. of Human Rights,* 233 A.D.2d 451, 649 N.Y.S.2d 942, 942 (2d Dep't 1996) ($200,000 to $500,000 for six plaintiffs who suffered mental anguish due to "lewd and offense" workplace harassment); *New York City Transit Auth. v. State Div. of Human Rights,* 185 A.D.2d 889, 181 A.D.2d 891, 581 N.Y.S.2d 426, 427 (2d Dep't 1992) ($450,000 award under State Human Rights Law upheld where evidence supported a finding that plaintiff's mental anguish could persist for the rest of her life). The extreme nature of the psychological injuries suffered by Katt is comparable to those in the cited cases. Even the defendant's own expert, Dr. Anderson, testified that after examining Katt he found her to be suffering from debilitating psychological trauma:

> I felt that she was quite disturbed. She had difficulty maintaining her through focus. She was extremely tangential, circumferential and referential, bordering on full paranoia, with particular reference to the police department. She also was showing signs of referentiality and distrust of the mental health system. I felt that the combination of the personality disorder and the post traumatic stress disorder had rendered her disabled, functioning at an extremely low level, even having difficulty with housework. . . .

(Tr. 760–761) Anderson further testified that his data showed Katt to be "totally disabled" as of March of 1999 (*Id.* 797) This testimony was entirely consistent with Kleinman's view that Katt is unable to normally function in society as a result of her employment at the Seventh Precinct, and that her psychological disabilities are likely to be permanent, even with counseling. (*Id.* 338, 361–62.)

Though defendants dispute that Katt's experiences at the Seventh Precinct could possibly have caused such disabilities, they do not dispute the extent to which she suffers from them. Defendants do not dispute that reasonable jurors could have found that Katt suffered extreme and humiliating sexual harassment from DiPalma and others, and the Court has already held that such jurors could also have found a causal link between those violations and Katt's indisputably disastrous condition *See supra* pp. 351–52 Defendants cite no case in which a plaintiff in a similar circumstance—suffering from permanent mental disabilities, unable to work, unable to maintain sexual intimacy, unable even to perform household chores—was required to remit an award for compensatory damages for emotional distress comparable to the amount at issue here.[46] An award of

---

**46.** Cases cited by defendants are not comparable. *See, e.g., Carter v. Rosenberg & Estis,* 1998 WL 150491, at *20 (S.D.N.Y. March 31, 1998) (remitting $75,000 award to $15,000 where "[plaintiff's] statements regarding her physical condition made clear that she suffered minimal, if any, physical manifestations of her alleged mental anguish"); *White–Ruiz,* 983 F.Supp. at 393 (sustaining an award of $100,000 for "serious stress during a substantial part of [plaintiff's] career" with no expert corroboration), *Funk v. F & K Supply, Inc.,* 43 F.Supp.2d 205, 227 (N.D.N.Y.1999) (remitting $450,000 award to $30,000 where evidence

$400,000 is no doubt a considerable one, but there was ample testimony in this case that the Seventh Precinct's pervasive and sexually hostile work environment has caused the plaintiff substantial and permanent psychological damage. Therefore, since the jury reasonably found that the plaintiff's acute psychological disabilities were caused by her experiences working in that environment, the jury's award of $400,000 falls soundly within the "reasonable range" of comparable cases, and cannot be said to shock the judicial conscience.

Accordingly, the defendants motion to remit is denied.

## CONCLUSION

For the reasons stated above, the Court grants the City of New York's motion for judgment as a matter of law with respect to the jury's $1 million punitive damage award. The defendants' motions are otherwise denied in all respects; the jury's award of $400,000 in compensatory damages shall remain undisturbed. The Clerk of the Court is accordingly directed to enter judgment for the plaintiff in the amount of $400,000.

SO ORDERED.

proved no more than "garden variety emotional distress"), *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662, 669 (S.D.N.Y.1995) (remitting $219,428 award to $20,000 where there was but "sparse evidence with respect to the magnitude and duration of any emotional injury or mental distress"); *Greenville Bd. of Fire Comm'rs v. State Div. of Human Rights*, 277 A.D.2d 314, 716 N.Y.S.2d 685, 686 (2d Dep't 2000) (remitting $100,000 award to $50,000 where expert provided "some sup-

port" for plaintiff's claim that mental anguish and irritable bowels were related to job discrimination); *Manhattan & Bronx Surface Transit Oper. Auth. v. New York State Exec. Dep't*, 220 A.D.2d 668, 632 N.Y.S.2d 642, 644 (2d Dep't 1995) ($30,000 award remitted to $7,500 where evidence gave "no indication of the duration of [plaintiff's] distress" or that plaintiff's weight gain "was related to the rejection of his [job] application")